Cabutiiees, J.,
delivered the opinion of the court.
The defendant, a slave of Ií. B. Hyde, was indicted and convicted in the criminal court of Rutherford county, for the murder of Sam, a slave of Richard H. Spann.
Yarious objections are here urged as errors in the proceedings below.
1. Pending the trial on the adjournment of the court for dinner, before the close of the proof of the State, the court permitted the witnesses to be discharged from *257 the rule under which they had been placed, and allowed them to disperse until the meeting of the court, when they were again put under the rule. The officer having them in charge was directed by the Judge to caution them against talking with any one on the subject of the trial. The defendant’s counsel had left the court house before this order was made, and consequently did not either consent or object. "When the examination of the witnesses was resumed after dinner, the defendant objected on the ground above stated, and the objection was overruled by the court, to all which there is exception.
We are not aware of any rule of practice that would make this error. The practice of examining the witnesses separate and apart from each other, at the request of either party, is invaluable in many cases for the ascertainment of truth, and the detection of falsehood. Such has been the experience of wise men in all ages, from the days of Daniel, that divinely-inspired Judge, down to the present time. By our practice, it is the right of parties to demand of the court an order that the witnesses shall not hear each other examined, or shall be kept together, which is called “a rule,” or “putting the witnesses under a rule.” But whether they shall be locked up and not permitted to disperse under any circumstances, or be ordered to keep out of the court house, we think depends entirely upon the sound discretion of the judge, governed and regulated by the circumstances of each particular case. It would be a very oppressive exercise of this discretion to keep them confined and not permit them to eat or disperse for any purpose, during a long trial, without some very strong cause appearing in some tangible form. On the other hand, this discretion should not give too loose a reign to the witnesses, against *258 tbe consent of tbe parties, so as to defeat tbe great object of tbe rule. But all tbis we tbinb, from tbe necessity of tbe ease, must be left to tbe discretion of tbe circuit judge, and it would be very dangerous for tbis court to undertake to regulate bim in sucb matters of practice, unless some plain rule was prescribed in the authorities, or laid down by the legislature on tbe subject.
If tbe circuit judge were to deny tbe rale altogether, or so practice upon it as to make it inoperative in tbe face of. an express objection of a party, then it would probably amount to error sufficient to authorize tbe granting of a new trial, because it would be tbe denial of a right to tbe party demanding it, that might be very fatal to bis cause. But we see nothing in tbe case before us for which we can reverse, in accordance with these principles.
2. Tbe next objection taken is, that tbe court refused to allow defendant to read tbe record made by tbe committing magistrate under tbe act of 1Y15, cb. 16, Oar. N. 426, of bis own examination, and tbe testimony of tbe witnesses. There is no error in tbis. Tbe defendant certainly was not entitled to bis own statements, made before tbe magistrate or any where else, as evidence for himself. He is not bound to submit to it, if be chooses to object, and so tbe accused ought to be instructed by every committing court. It is rather intended by tbe statute, as a privilege to bim, that be may be “ allowed to speak for himself.” He may clear - himself of suspicion by developing a state of facts, or unravelling mysteries that will lead to a clear manifestation of bis innocence, and to bis discharge. But it certainly was never intended that be should seize upon tbis privilege to *259 manufacture evidence for bimself to be afterwards used on bis trial.
But tbe court also rejected tbe examination of tbe witnesses in tbe case. This presents a more doubtful question; but we tbink upon principle, tbe exclusion was right in tbe state of facts then existing. We tbink the only ground upon which such examination could be introduced, would be to discredit some of tbe same witnesses whó bad been examined in tbe pending trial. But in order to make this legal, it would be necessary first to interrogate such witness as to what be may have said before tbe magistrate, that be might have a chance to .set bimself right, if be can. We are not aware that this question has been adjudicated before, but it must be governed by tbe same principle that has been uniformly applied to tbe case of tbe impeachment of a witness, by proving that be has made statements to other persons in conflict with those made on bis examination in court.
Tbe rule is, that this cannot be done, unless be is first particularly interrogated as to such anterior statement. This is absolutely required to make tbe contradictory evidence legal. The same rule must govern this case; there is no reason for a distinction; as then, no witness was asked what be bad said or sworn in bis examination before the- committing court, that could not be read to contradict or impeach him, which is tbe only purpose for which it -would be admissible. It is true that what a witness swore before a magistrate or court, may be proved as evidence in tbe event of bis death. But this is on another and distinct principle.
8. It is next contended that tbe court erred in tbe rejection of evidence to show tbe explanation of tbe defendant of tbe fact that be bad blood upon him a short *260 time after the homicide occurred. The witness for the State proved that he met the defendant at the junction of a path coming from the direction where the body was found, and the road which he was going, some hundred yards from the body, and probably but a very short time after the killing, and saw blood upon him in several places. He said the prisoner then and there gave him some explanation about the blood. The attorney general objected to the question of defendant’s counsel, calling for such explanation. Hie objection was sustained and the evidence rejected. A party cannot be allowed to make evidence for himself, and nothing that he can say will be received as evidence for him unless it constitutes a part of the transaction, the res gesim. Does this fall within that exception? "We think not. Declarations are not admissible as part of the res gestae, unless they were made at the time of the act done, which is under investigation, and which they are calculated to characterize; they must so harmonize and be connected with the act done, as to constitute a part of it. The declarations offered in'proof must be contemporaneous with the main fact under consideration, and so connected with it as to illustrate its character. 1 Greenl. Ev. 124; 3 Con. R. 250; Paige, 611; 8 New. Ham. 40.
So, in order to make any thing said by the defendant evidence for him, it must have been so connected with the fact of killing as to constitute a part of the transaction. Eor instance, if he had been heard to say anything at the time, and on the ground, in justification, or excuse of himself, it would have been competent proof. But what he said about it, or any fact tending to show his guilt, after the transaction was over, would not be a part of the res gestae. It must be connected with an action *261 then transpiring. That was not so here. The deed was done, the bloody tragedy closed, and the defendant some distance from the fatal battle ground. There is no authority extending the principle so far, and the declaration of defendant was properly rejected.
4. Objections are taken to the charge of the court. We have read it over very carefully and consider it a correct exposition of the law as far as it goes. It is not defective on the points insisted upon in argument. It would have been more perfect, if the court had explained to the jury the effect of the reconciliation and subsequent friendly relations of the parties, upon the previous threats that had. been proved. Former grudges and threats evince the existence of express malice as charged by the judge, but their force and effect to show the existence of malice at the time of the killing, would certainly be impaired by time and subsequent reconciliation and friendly relations. To what extent this effect would be produced, would of course be a question for the jury. It was due to the defendant, to present this view of the case to the jury. And it would also have been proper for the court to have embraced in his charge, the familiar principle of criminal law, that where there is an old grudge, and a fresh legal provocation, the killing will, if the circumstances permit, rather be attributed to the recent provocation, if it be a sufficient one, than to the old grudge. As there was no human eye looking upon this transaction, and none but the accused could know the circumstances attending it, the jury would have to judge from the facts proved, whether the case was manslaughter or murder. They could have no difficulty, under the proof in this case, as to the fact of killing, but whether it was done upon malice or *262 passion, so as to make a ease of manslaughter or murder, that is, whether the facts proved were sufficient to remove the legal presumption of malice arising from the act of slaying, and the weapon used, and the former threats, would constitute their only difficulty. To come to a conclusion on this question, they would have to carefully weigh the concomitant facts, such as the commencement of the quarrel by the deceased that day, the remark of the prisoner that he had nothing against him, the relative size and strength of each, the appearance of the ground on which they fought evidencing mutual combat, the condition of the clothes and person of Nelson and the deceased, tending to show the same. They would also look to the state of Sam’s feelings towards Nelson, as indicated on that day and previously, as circumstances making it probable that he might have made the attack and produced a state of the case that would reduce the killing to manslaughter. We think the charge of the law ought to have been more full and explicit on these points, in a case of life and death, where every thing must depend upon the weight and beaiing of circumstances and the strength of presumptions. It is true in general, upon a failure to charge fully where there is no essential point omitted or wrongly charged, it is necessary that it should appear that the party asked for further instructions, and the court refused to give them; but in this case we regard the omission as too important to the life of a human being, to place it upon that ground. "We do not say that it would have produced a different result, but it is enough that it might have done so.
Upon the facts as they are presented to us in the bill of exceptions, taken in connection with this defect in the *263 charge, we are not willing to consign the defendant to the gallows, without another trial. It may be that the proof is not presented to ns as strongly as it was before the jury, but we can only look to and act upon it as it is in the record.
As the case will have to be again tried we will forbear to comment further upon the proof. It is enough for us to say that, as it is written down, it is hardly sufficient to Sustain the verdict; and for this reason and because we think the defendant did not have the advantage of a full explanation of the law on the points before designated, we reverse the judgment refusing a new trial and remand the prisoner for another trial.