JOHN W. HARDIN

*v.*

STATE OF TENNESSEE.

355 S.W.2d 105.

(*Nashville,* December Term, 1961.)

Opinion filed March 7, 1962.

Petition for Rehearing Denied May 4, 1962.

(See 356 S.W.2d 595.)

118

JIM C. GALLOWAY, IKE R. CLINTON, Memphis, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, LYLE REID, Assistant Attorney General, for the State.

MR. JUSTICE BURNETT delivered the opinion of the Court.

Hardin, a white man, thirty-nine years of age, was indicted for second degree murder for killing with an automobile, and for driving while under the influence of an intoxicant. He was found guilty of both charges and sentenced to not more than ten years on the homicide charge and fined $10.00 and sentenced to eleven months and twenty-nine days on the driving while drunk charge. He has seasonably appealed and filed many assignments of error supported by an eighty page brief. Arguments have been heard. We now have the matter, after spending several days reading this large record, authorities, briefs, etc., for disposition.

■ The case depends entirely upon circumstantial evidence to establish both the *corpus delicti* and the criminal agency of the accused. In a drunk driving case and a homicide committed in the act thereof depending upon circumstantial evidence, it is no different from any other fact case wherein circumstantial evidence is necessary for conviction. In *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451, we attempted at some length to set forth the necessary rules to be followed in establishing a case on circumstantial evidence. Briefly, it is necessary in such a case that all the essential facts must be consistent with the hypothesis of guilt, that is to be compared with all other facts proved; that the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that the accused is the one who committed the offense.

■ These facts must be proved so as to satisfy the jury, beyond a reasonable doubt, of all the facts necessary to constitute the crime charged before a verdict of guilty is justified. Such facts must be of such a conclusive nature and tendency, leading on the whole, to a satisfactory conclusion and producing in effect a moral certainty that the accused, and no one else, committed the offense. In considering a case thus the weight of this circumstantial evidence is a question for the jury who likewise are the ones to determine whether or not the inferences to be drawn from such evidence, and the circumstances surrounding them, are consistent with guilt and inconsistent with innocence.

 What is meant by reasonable doubt in the mind of the jury is that doubt which may be engendered by an investigation of all the proof and the reasonable inferences to be drawn therefrom, and after considering such an inability to let their mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from a possibility. Absolute certainty of guilt is not demanded by the law to convict of a criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

From these preliminary remarks as to the requisites in a case of the kind it naturally follows that a rather detailed statement of facts is necessary.

Just shortly before 11:00 o'clock at night on May 19, 1960, a white lady, fifty-two years of age, was struck by an automobile at the intersection of Jackson Avenue and Breedlove Street in Memphis, and died within a few minutes as a result of the injuries sustained.

It is shown that the deceased and another lady boarded a streetcar in downtown Memphis and got off of this streetcar at Jackson Avenue and Breedlove Street in Memphis, about 10:55 and not later than 10:57 P.M. on this night. The light being green in the direction in which the deceased was traveling, she walked across the street and when she had gotten nearly to the curb on the opposite side a 1956 or 1957 Ford going down this street struck her and knocked her up in the air over the front of the car almost to the other side of the street. The other lady who got off the streetcar with the deceased was standing on the corner waiting for the light to change so that she could walk across in another direction. She

saw the accident and testifies that she saw a red and white 1956 or '57 Ford coming down the street at a rather reasonable rate of speed until it got within a few feet of the deceased when it suddenly speeded up and struck the deceased as above stated, which caused her death. After the Ford struck the deceased it proceeded on down the street in the direction in which it was going at a very rapid rate of speed.

This lady, who was standing on the street and saw the accident, says that the car that struck the deceased was red and white—red with a narrow white strip down the side; and that it had the same appearance as the picture of the plaintiff in error's car. The plaintiff in error's car was black on the bottom with a white strip running down the side and black on top. This witness said that she could not identify the person who was driving this car but there was only one person in the car and he appeared to be in his forties, having "peppery gray hair" with a receding hairline, and that he was wearing a light blue shirt. At the time of this accident the car that struck the deceased was the only one within sight on either street.

Another lady, who was driving west on Jackson Avenue (the car that struck the deceased was driving north on Breedlove) and was about a half a block away from the intersection, stated that she saw the car hit an object which she first thought was a dog. She thought the car was entirely black. This lady notified the police who soon arrived.

About three stores from the intersection (apparently the fronts of these stores are rather narrow) on the south side of Jackson Avenue was a restaurant. This

restaurant was about a half a block away from the intersection of these streets where this accident happened. This restaurant had a parking space on both sides of the driveway at the rear connecting the parking areas. It had three entrances. There was also an alley or open area which runs from this restaurant behind the other buildings on that end of the block and enters Breedlove a hundred feet south of the intersection where the deceased was struck. The parking area around this restaurant, the driveway, and the alley leading to Breedlove (Breedlove is the street on which the car was traveling which struck this woman) at the time of the homicide were surfaced with sand and gravel.

There are two witnesses in this record who testify that between 10:30 and 11:00 o'clock on this night they were in this restaurant along with the wife of the owner when the plaintiff in error entered from a door on the west side of the restaurant. They say the plaintiff in error had in his pocket a paper sack which appeared to contain a bottle of whiskey, and when he came in he asked for a chaser and a glass of ice; that after the wife of the owner looked at her husband, the husband told her not to serve him and told the man, the plaintiff in error, that he already had enough and they would not serve him a chaser for any more liquor. When the plaintiff in error took the witness stand herein he admitted that he had had a few drinks and that he had this bottle of liquor in his pocket and that he was denied this chaser at this restaurant. The plaintiff in error immediately upon being denied this chaser left and apparently got in his car and "gunned" it or raced the motor and the car wheels were heard spinning in the gravel on the outside by the occupants of this restaurant. Immediately after the plaintiff

in error left these witnesses heard "some sort of racket" out on the street and after hearing this noise they observed the people on the street in front of the restaurant stopping and looking back toward the intersection. One of these witnesses, who was in the restaurant, testified that in his opinion the plaintiff in error was under the influence of alcohol and that when he was denied this chaser he seemed to be "a little put out" because he was refused service.

Another witness offered on behalf of the State testified that at approximately 11:00 P.M. on the date of this homicide he was driving south on Breedlove (this is going in the opposite direction from which the car was that struck the deceased) approaching the intersection of Jackson and Breedlove when he noticed the headlights of a car coming toward him dipped as the car crossed Jackson Avenue; the car then veered toward the center of the street so far that the witness pulled his car to the curb. He said that this vehicle was coming north on Breedlove and when it passed him it was accelerating rapidly. He likewise stated that the car appeared to him as a silhouette and that he thought it was a dark color. When this witness reached the intersection he found the deceased lying in the street.

A doctor was driving south on Breedlove at approximately 11:00 o'clock when he met a car going north, which he says was going at a high rate of speed and was making "a peculiar roar" which in his opinion was caused by "straight pipes". When this doctor reached the intersection of Jackson and Breedlove he found the deceased lying in the street. He administered such treatment as was possible and noticed that she had sustained

a fractured jaw, two fractured arms and other serious injuries. An ambulance arrived while he was there and the deceased was taken to the hospital, but she was dead upon arrival.

Another witness for the State was an eighteen year old boy who worked for a motorcycle company in Memphis and lived on the west side of Breedlove about a half block north of Jackson Avenue. He testified that just before 11:00 o'clock on the night of the homicide as he was going into his house he heard, going north on Breedlove, a car with "glass packs" and saw that it was a 1956 black and white Ford Victoria with Mercury skirts.

A meteorologist testified that eighty-seven hundredths of an inch of rain fell between midnight and the time of the homicide on that day but the streets were dry at the time of the homicide. At the scene of the accident about twelve or thirteen feet out in the street there was found a quantity of wet sand at the point of impact and it appeared to have fallen from a moving vehicle. At and near this sand was blood. Other witnesses testified that all the driveways on Breedlove south of Jackson were surfaced with old concrete except the one entering Breedlove from the alley that led to the restaurant hereinabove referred to.

The plaintiff in error's car was a 1956 Ford Victoria. It was black on top, black on the bottom with a white center stripe. The paint had a lacquer finish and the car had Mercury fender skirts, as described by the young motorcycle boy above.

Eleven days after the accident the car of the plaintiff in error was examined by the police department and they stated that at that time it had stock mufflers which

appeared to be new, and that the car "underneath was unusually free of dirt and debris". This witness found on the underside of the car a small substance which was later identified as a piece of skin tissue from a light skin human. There is no connection other than this with the deceased.

This witness likewise testified that the right side of the grille was damaged. An expert witness of some twenty-four years experience in fixing damaged cars, having seen and knowing what caused the damage, was qualified by the trial judge as an expert with regard to automobile bodies. This expert testified that the compression in the grille was caused by striking a non-rigid object, such as a dog. He was asked a hypothetical question and testified that the damage to the plaintiff in error's car was consistent with striking the deceased in the manner that she was struck. The police officer also testified the dress which the deceased was wearing was examined and photographed by him and then a doctor from the University of Tennessee examined it under a microscope, etc., and that this dress bore tire prints similar to the prints made by the tires which were on the plaintiff in error's car on the date of the homicide.

Another police officer, a friend of the plaintiff in error for some twenty-five years and his family, one of the investigating officers in the case, testified that the plaintiff in error had previously been a member of the Memphis police force and had been an efficient hit and run investigator, but for unknown reasons as far as this record is concerned the plaintiff in error was suspended from the department twice and finally dismissed. This friend of the family and a Captain in the Police Depart-

ment went, after obtaining some of the information above, to the home of the plaintiff in error the day following the accident and asked to see his car. He gave it a cursory inspection in the driveway and saw the dent in the grille of the car. Either this officer or another officer went the day after the accident or the following day and asked to make an inspection of the car and was told by the plaintiff in error that the car had been driven by his wife that morning and was in a parking lot of a grocery store. It was shown and testified to by the wife of the plaintiff in error that this parking lot was three blocks away from her home; that on the day after the accident she had driven this car this three blocks; parked it in this grocery store parking lot and then had caught a bus and gone on to her work. The Police Captain went to this parking lot and walked through it and said that he was unable to identify this car or any other car as he was looking for a car that was all smashed in; that he didn't find any such car and consequently made no further investigation of the matter.

The plaintiff in error seems to have been from the record here one of those car owners who took very good care of his car; had it painted up within a few months prior to this wreck at a very large expense; he had initialed floor mats on the floor and things of that kind. He likewise had glass pack mufflers on the car and other things as described by the motorcycle boy above, such as Mercury mud guards and things of that kind. These glass pack mufflers had been taken off the car when it was investigated by the police department a few days after this happening. On June 20th, immediately after the happening of the accident, this car was traded to the

Rambler people for a Rambler, and they in turn sold the car for some $900.00 to another person.

No arrest was made of the plaintiff in error from the time of this accident until September 29, 1960. Apparently the reason for this difference in time was the fact that the witness who stood on the corner and saw the wreck said that the car was a red and white Ford and the Police Department were looking for such a Ford. But after making a full and thorough investigation the Police Department evidently concluded that the plaintiff in error was the person guilty and he was arrested on September 29, 1960. According to some of the officers' testimony, who made the arrest, the plaintiff in error while being taken to the police station stated that he had been expecting them and that he had not been able to sleep since the accident happened. At the police station the officers were joined by an investigator from the District Attorney General's office. These officers talked to the plaintiff in error from about 4:00 or 5:00 o'clock in the afternoon until about 9:00. Two of the officers were friends of from fifteen to twenty-five years of the plaintiff in error, and they talked about a little of everything. More of what was said in this interrogation will be detailed at some length hereinafter. At least, suffice it to say, these officers said that plaintiff in error admitted that on the night of this homicide he was drinking, that he was refused service at this restaurant, that he arrived home at 11:05 P.M.; that at the time of the wreck he had these glass packed mufflers on his car; that he had taken them off because he was afraid that they might connect him with the homicide. The officers likewise say that he told them at that time that he didn't know whether

he struck the deceased or not because he was drunk and he didn't know what had happened.

At the time of this conference, after the wreck, the plaintiff in error gave a written three-page statement. It is not a confession, nor is it attempted to be offered as a confession. He says that a young lady and a man from the Attorney General's office were present, the man from the Attorney General's office asked him questions and the young lady wrote them down on the typewriter. It was signed by him and each page was initialed by him. In the statement he acknowledged that he had been charged with second degree murder and that he was advised that any statements made by him could be used against him. When he was on the witness stand he said the reason he signed and gave this statement was that he had been so worried by the constant questions and different kind of questions asked him by these officers at the time that he didn't know what he was doing. He admits though that they treated him nicely and that he had known one of the officers for at least sixteen years and another one for at least twenty-five years, and that they were good friends of his. In this statement he admitted that he was at that restaurant on that night (he likewise admits this on the witness stand); that he had a bottle of whiskey and that he was drunk. He says in the statement that he doesn't know whether he ran over a woman or not because he was too drunk. He stated in this statement that he got home at 11:05 P.M.; and that he lied to a Captain of the Police Department (a long time friend of his) when he had previously, a day or two after the accident, told this Captain that he had arrived home on this night at 10:35. The statement, which he signed, shows

that he gave it freely and voluntarily and without promise of reward.

He, after talking to two or three of the policemen together, was left alone with the policeman of some twenty-five years friendship and talked to him before he gave this statement. All of these police officers testify herein, and testify that he said what he said and answered these questions freely; and say that he said he was so drunk that night that he didn't know what he was doing; that this thing had bothered him and he had been in trouble all his life and one thing and another of the kind, which clearly shows to us that there was no mental or physical harassment such as to cause the man to make statements that were forced, but the statements were freely made. There is some evidence to the effect that during this conference he asked some of the officers to call his wife and tell her where he was. Whether this was done or not the record does not show.

It has been indicated a number of times hereinabove that the plaintiff in error took the witness stand in the absence of the jury and testified about his conference with all these policemen as to whether or not it should be admitted. After his testimony and after argument and testimony of others the trial judge concluded that the statement was not forced but was done in a relaxed manner and given freely by the plaintiff in error. This record convinces us of the correctness of this finding.

While on the witness stand the plaintiff in error admitted having several drinks on the date of this homicide, but denied on the witness stand that he was drunk. He admitted that he stopped in this restaurant, but stated that he entered Jackson Avenue from the parking area

beside the restaurant rather than entering on Breedlove. He denied running over anyone and denied telling the police he was drunk on the night in question. He testified that on the day he was arrested that he asked that his wife be notified of his whereabouts and he requested a lawyer which was refused. He stated that he was questioned so long and so persistently that he was mentally unbalanced when he gave the written statement. This though, his statement to that effect, is the only thing in the record of the kind. From all the other evidence pro and con it is inconceivable to us that this statement is true.

█ A number of character witnesses, the mother, wife and son, testified on behalf of the plaintiff in error. A number of his painting associates testified as to having seen his car and didn't think it was any different before and after the wreck. As to the weight of their testimony that is a question for the jury. Some of them said they didn't pay any particular attention to the car and others were certain that things about it had been on there before. The wife and the son testified that he got home exactly at 11:00 o'clock. The mother testified that she came in at 11:20 and that he was in bed snoring. Taking it as a whole after the cross-examination of the plaintiff in error. on the witness stand it seems to us that he by his own cross-up on a number of things he had said that he put himself in a position where probably the jury didn't believe much of anything that he said about the events of this night. For instance a number of witnesses he called on his behalf with reference to the car and things of that kind all testified that he drank a good deal. Then the mere fact, too, that the restaurant people had refused him a set-up on this night shows that he must have been pretty

drunk, and that probably the statements that he made to these officers that he was drunk is more likely to be the truth than not.

The first five assignments of error herein are based on the argument and contention as viewed from the plaintiff in error's standpoint that the evidence preponderates in favor of his innocence and against his guilt. Of course, the man comes here presumed to be guilty and it is up to him to show that the evidence preponderates against his guilt. He doesn't come in the same position as he came when he went to trial. After very carefully reading this record and from what has been said above as to what the record shows, we are firmly convinced that this circumstantial evidence herein meets the test as set forth in the Marable case cited in the outset of this opinion. These facts are consistent with plaintiff in error's guilt and they to our mind, as they must have to the jury, exclude every reasonable theory by which he could be innocent. It is not necessary for us to again review these facts.

Assignments six through nine are to the effect that the court committed error in permitting the plaintiff in error to be tried on an indictment charging second degree murder for killing with an automobile and another indictment charging driving while under the influence of an intoxicant. These two charges are based on exactly the same transaction and are not repugnant or inconsistent. It would be the grossest folly to demand a separate trial under each indictment when they both grow out of an identical situation. This Court has held many times that you may join a felony and misdemeanor where they are coordinate offenses. *Tenpenny v. State,* 151

Tenn. 669, 270 S.W. 989, and other cases which may be found by Shepardizing the Tenpenny case.

■■■ Assignments ten and eleven charge that the admission of the testimony of these officers who talked to this plaintiff in error immediately after his arrest and questioned him and took his written statement violated the Fourteenth Amendment of the United States Constitution. The latest case on this question wherein all preceding cases that we know of are reviewed is *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037. None of these cases though hold that under a factual situation as here is it a violation of the Fourteenth Amendment. The statement introduced of conversations the officers had with the plaintiff in error at the time were not confessions and were not necessary for conviction because there was ample evidence otherwise and we feel that the standards of admissibility demanded by the due process clause of the Fourteenth Amendment have not been violated herein by reason of the facts and circumstances, taking into consideration the age, experience, friendship of this former officer with other officers and things of that kind, and his talking with these officers and being kept and talked to by them as he was certainly does not bring it within prohibited evidence.

■■■ This arrest and detention without any mistreatment concededly by the plaintiff in error, and in some instances was friendly, was not a violation of our Code Section, 40-604, and his temporary holding or arrest is permissible before the plaintiff in error is taken before a magistrate, because after an accused is examined he may be released with no warrant at all issued. See sec. 40-814, T.C.A. We do not have any statute for a prompt

arraignment, but we have, so to speak, a no-prompt arraignment statute as thus referred to. Thus it is that *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, is not in point. As is said in *Culombe v. Connecticut*, supra, ''And although we adhere unreservedly to McNabb for federal criminal cases, we have not extended its rule to state prosecutions as a requirement of the Fourteenth Amendment'', citing authorities.

 The plaintiff in error attempted to introduce a newspaper reporter to try to show that he had talked to the State's witness who was standing on the corner when the accident happened and she made inconsistent statements to him with that given in testimony on the trial. The trial court would not permit the introduction of this proof because the proper foundation had not been made therefor. Our reading of the record convinces us that this was a correct ruling, because there was no foundation laid to impeach the witness in this case. Such is necessary, *Cole v. State*, 65 Tenn. 239. Too, this testimony which we have read varies very little from the testimony of this witness on the witness stand. She stated on direct examination, and this was emphasized on cross-examination, that the car that she saw hit the deceased was a red and white dark colored Ford of this kind; while the testimony sought to be offered is to the same effect but the fact of the particular color had borne on the mind of this woman. At the most it is harmless error. It was trying to emphasize the fact of the color of the car to the jury. There is no contradiction of this woman; she says that and that is what she thought, but the jury evidently concluded that it was a black and white rather than a red and white car passing at this time near midnight; that the woman was just mistaken about

the color, and it is their province to determine any factual issue which is presented to them. We all know frequently, to be perfectly honest, the most honest witnesses see things entirely differently.

■ There is testimony of the expert as to what caused the dent in the grille of the car, whether or not certain things would cause such a dent, in answer to a hypothetical question that we have heretofore referred to. This witness was offered in rebuttal to contradict the evidence introduced by the plaintiff in error that the damage to his car was caused when struck by a hard object. In reading the record, the plaintiff in error in his direct examination says that he got this hole in the front of his car when it was hit out on a construction job. On cross-examination he tells another tale about it. Of course, these were things for the jury. As to whether or not this witness was proper on rebuttal is purely a discretionary matter with the trial judge, and as to his qualifications and as to what he says we think here that this was properly admitted.

■ Then, too, complaint is made as to two of these police officers testifying in rebuttal about certain statements that the plaintiff in error had made, because they had testified to this on direct examination and that calling them in rebuttal was merely to reemphasize the matter. Clearly, this is a discretionary matter and the trial judge has the discretion as to whether or not certain things are allowed to come back in. We cannot say that there was any error in this. At least it would not be prejudicial.

■ Assignment fifteen insists the court committed prejudicial error in commenting upon the evidence when he charged the jury. The argument is that the same error

was committed here by the trial judge as was committed in *Dykes v. State,* 201 Tenn. 65, 296 S.W.2d 861, and related cases. We have carefully read this charge and are more than satisfied that the charge was not a comment on the evidence but was a fair and correct charge.

The part of the charge complained of was merely the court telling the jury what the law was as laid down by this Court in *Rogers v. State,* 196 Tenn. 263, 265 S.W.2d 559, to the effect that one driving an automobile while in an intoxicated condition in such a manner as to endanger the lives of others in violation of the drunk driving statute would be guilty of murder in the second degree. This case likewise holds that complete intoxication at the time was no defense. On this point that is whether or not he commented on the facts in violation of the Dykes case and others, the court said this:

"The jury are the [sole] judges of the facts, and of the law as it applies to the facts [in the case]. In making up [your] verdict, [you] are to consider the law in connection with the facts, but the court is the proper source from which [you] are to get the law. In other words, [you] are judges of the law as well as the facts, under the direction of the court."

This is a fine statement of what the law is.

■■■ Then there are a couple of assignments to the effect that the court committed error in giving orally a part of the charge in regard to the misdemeanor of driving while under the influence of an intoxicant. The bill of exceptions does not show that any part of the charge was given orally, and there is no evidence introduced to this effect on motion for a new trial. Assignments of error cannot be looked to for matters not appearing in

138

the record, and the Court cannot properly consider matters which are not in the record. We have read the charge from beginning to end and think that it is a full and fair charge. No objection was made to the charge, nor were there any special requests asked.

■ There are some two or three assignments to the effect that the punishment given by the jury violated Article 1, Section 16 of our Constitution and that it was an excessive, cruel and unusual punishment. We do not think so. The punishment given in the second degree murder case was the minimum, and as long as it is within the statute it clearly does not violate the constitutional provision referred to.

There is another assignment complaining about a picture taken by a policeman. This policeman frankly says on the witness stand that the picture was not set in focus right and then this was corrected, and it was shown what kind of lights were at the intersection. There certainly could be no error in this.

■ In the course of the trial, as commented on in the early part of this opinion, the dress that the deceased had on was introduced and testified to by this University doctor who had looked through the microscope and found certain grains of sand that was like the sand on the street knocked off the car embedded in this dress. The microscope was brought in and the plaintiff in error, the jury, the plaintiff in error's lawyer and everybody else was allowed to look through the microscope at these grains of sand. The argument is that since the microscope could not be brought up and that you couldn't look through it and show it in the record and it could not be made part of the bill of exceptions then it was error.

During the introduction of this part of the evidence it was suggested that the plaintiff in error and his counsel could come up and look through the microscope and at that time the counsel for the plaintiff in error agreed that the University doctor who photographed these matters as seen through the microscope could make the pictures part of the record. Apparently this was done and certainly there is no error in this.

The last four or five errors assigned are grouped together and we have carefully examined them as well as read the record and think there is no possible error therein. For instance, one of these assignments goes to the fact that in the testimony it was shown that this dress was sent to the F. B. I. for comparison of the tire marks on the dress with marks made by the tires on the car of plaintiff in error. The record shows that the F. B. I. says that they couldn't positively identify it and there wasn't any testimony that it was any more than they admitted in the trial of the case. Both sides admitted there were lots of B. F. Goodrich tires of a certain make and they have a standard form, and as to whether or not these were the tires that ran over the deceased there wasn't any damaging testimony or anything of the kind to the plaintiff in error on that. It was more or less a speculative matter that the jury could consider but they could likewise consider the fact that the tires on his car would make similar marks to those that were on this dress. Under such a situation there is clearly no error.

One of these errors assigned was that in the voir dire examination of jurors something was said about the indictment and the trial judge explained that the indict-

ment was an ex parte matter and didn't mean that the plaintiff in error was guilty of anything of the kind. Clearly under the colloquy between the parties there at the time, this didn't constitute any reversible error.

We have very carefully read this record and the authorities and briefs, and are thoroughly convinced after making a study of it there is no error in this record, and that the facts convince us even when reading this record that this man was guilty of this crime.

 The conviction of the $10.00 fine and eleven months and twenty-nine days in the workhouse given under the drunk driving indictment must be reversed under the authority of *Patmore v. State,* 152 Tenn. 281, 277 S.W. 892, and many other cases which can be found by Shepardizing this case. In the Patmore case the Court gave as the reason for this holding this:

"The principle upon which the decision in the cases rest is that two or more separate offenses which are committed at the same time and are parts of a single continuing criminal act, inspired by the same criminal intent, which is essential to each offense, are susceptible to but one punishment".

Then the Court went on to say that in these cumulative punishment cases growing out of the same state of facts that the Court referred the verdict to the higher offense, and the judgment upon that count affirmed, while the judgment in the lower would be reversed. Thus it is that the judgment in the instant case will be so modified as to limit the conviction and sentence to the indictment charging second degree murder, and with this modification the judgment is affirmed.

### On Petition to Rehear.

Counsel for Hardin have filed a very courteous, respectful and dignified petition to rehear.

 This petition in the first instance again complains that the court did not include or reduce his charge in writing on his instructions on the misdemeanor. We answered that in the original opinion, and in addition to the reasons we assigned in our original opinion and since the misdemeanor conviction was reversed certainly there cannot now be any complaint on this proposition.

 The next complaint in this petition is with regard to the court's instructions in reference to the felony in which the conviction was affirmed. The original assignments, which were, we think, fully and correctly answered in our original opinion, made similar complaints and we see no reason to burden the matter further in reference to this question. The defendant now says that since driving while intoxicated in this case was an integral part of the crime of murder the failure on the part of the trial court to charge the jury in this respect was reversible error even though no special instructions were requested. We think the defendant overlooks the fact that the record before us is complete and contains the full and complete charge, which includes, of course, proper instructions in regard to driving while intoxicated, reckless driving, and the causal connection between the defendant's acts and the death. When the record, as it stands, shows no error the responsibility of showing that any charge given orally on a misdemeanor had any effect in the matter is on the plaintiff in error, and as the record stands we find no prejudicial error.

Many pages of this petition to rehear are taken up with the fact that the trial court failed to properly instruct the jury in regard to circumstantial evidence and quotes at length from *Bishop v. State,* 199 Tenn. 428, 287 S.W.2d 49, and other cases therein cited to support the proposition that certain excerpts taken from the charge in this case are erroneous compared to other cases cited in this petition to rehear. On page 647 of the record there appears a full and correct charge as to circumstantial evidence.

██ ██ It is complained, too, in this petition to rehear that the trial court erred because it failed to charge the jury that in order to convict it must find that Hardin's acts caused the death, and that the court was required to charge the jury that it "must find that the Defendant was driving his automobile while intoxicated and in such a manner as to endanger the lives of others." This quotation is an incorrect statement of the law. Driving an automobile while under the influence of an intoxicant or *in* such a manner as to endanger the lives of others is conduct *malum in se* which supplies the necessary criminal intent and eliminates the necessity of showing that death was the natural and probable result of the criminal act. *Edwards v. State,* 202 Tenn. 393, 304 S.W.2d 500, and many cases cited therein. A full summary of previous cases on this question citing applicable rules will be found in *Smith v. State,* 196 Tenn. 168, 264 S.W. 2d 803. The charge and the facts in the instant case clearly bring this case within the rules as set out in the Edwards and Smith cases cited supra.

It is next contended in this petition to rehear that this Court should have reversed the conviction herein on the

basis of *Culombe v. Conn.*, 367 U.S. 568, 81 S.Ct. 1860, 6 L. Ed.2d 1037, as cited by us and amplified as applying to the facts in the present case in our original opinion. In our original opinion we cited the Culombe case and attempted to show wherein the facts of that case as well as all others on the proposition passed on by the Supreme Court of the United States that were cited in that case were not applicable to the present case, because the confession or statements made in the present case were not obtained in violation of the Fourteenth Amendment to the United States Constitution, but were made freely and voluntarily.

After a thorough study of this petition to rehear we are satisfied that nothing new has been presented herein and that the petition must be denied.