**John C. JAMES, Plaintiff in Error,**

**v.**

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

Nov. 23, 1973.

Certiorari Denied by Supreme Court Feb. 4, 1974.

Lyle Burrow, Bristol, for plaintiff in error.

David M. Pack, Atty. Gen., Phillip W. Brooks, Asst. Atty. Gen., Nashville, Carl K. Kirkpatrick, Dist. Atty. Gen., Kingsport, for defendant in error.

## OPINION

OLIVER, Judge.

Charged by presentment and convicted in the Criminal Court of Sullivan County of aiding and abetting in the sale of marijuana, for which he was sentenced to imprisonment in the county jail for six months and a fine of $500, James has duly perfected an appeal in the nature of a writ of error to this Court.

It was stipulated that the amount of marijuana involved in the transaction was less than one-half of an ounce, and that the defendant was subject to be tried only for a misdemeanor. In substance, the trial court so instructed the jury, charging them the provisions of TCA § 52–1432(a)(3), (b)(1).

Since an aider or abettor is deemed a principal offender and punishable as such (TCA § 39–109), upon finding the defendant guilty of aiding and abetting in the sale of less than one-half of an ounce of marijuana, under the provision of the drug control law of this State just cited, the punishment of six months imprisonment in the county jail and a fine of $500 assessed by the jury was authorized.

By his first Assignment of Error, the defendant challenges the sufficiency of the evidence. We summarize it. Robert Cameron, an undercover agent for the Tennessee Bureau of Identification, was in Lum's Restaurant in Bristol, Tennessee with his date about 9:00 p. m. on May 4, 1972. The defendant, Randy Freeze and Richard Owens came in and sat down at a table near Cameron, who asked Freeze if he had any drugs for sale and Freeze replied that all he had was marijuana but did not have any with him at that time. Cameron stated that he wanted to buy some marijuana and Freeze told him about what he had and the price. After finishing his beer, Freeze, the defendant and Owens left together and the defendant stated they would be back shortly. Cameron testified he assumed the defendant heard this conversation. Half an hour later, the three men returned and Cameron and his date went to the parking lot. Cameron got into the back seat of the Volvo belonging to the defendant who was driving. Freeze, who was in the front seat, handed over his shoulder a plastic sandwich bag for Cameron's inspection. Cameron then gave Freeze $20 and left. He further testified that he thought everyone in the car told him how good the quality of the marijuana was, and that the defendant told him that it was good grass.

The defendant testified that in Lum's Restaurant Cameron called Freeze over to his table and they talked about a minute but he could not hear their conversation; that Freeze then told him he owed Cameron a favor and asked him to take him (Freeze) home, and that he did so; that

when they got there, Freeze went inside his home and came back out and got in the car and they returned to the restaurant; that, wanting to go home himself, he stayed in the car while Freeze went in the restaurant and got Owens, Cameron and the latter's date; that when they came outside, Cameron's date got into Cameron's car, Owens and Cameron got into the back seat of the defendant's car and Freeze got into the front seat; that Cameron and Freeze talked briefly and Cameron said, "I'd like to stay here and smoke a joint with you guys, but I've got a date in my car, and I've gotta go"; that while this was going on he was looking at some people he knew in another car parked beside his, saw nothing pass between Cameron and Freeze, and did not know what Freeze was doing and received no money himself.

Freeze, testifying as a defense witness, said that after he, the defendant and Owens went into the restaurant, Cameron motioned for him to come over to his table; that when he did so, Cameron said that he (Freeze) owed him a favor and wanted some grass; that he told Cameron he had some at his home, and then asked the defendant to take him there, telling him that he had to pick up something for a friend; that the defendant drove him to his house and he went inside and put the marijuana in a plastic bag and returned to the defendant's car; that when they got back to the restaurant he went inside to get Cameron; that Cameron and Owens got into the back seat of the defendant's car, and he got into the front seat and passed the marijuana over his shoulder to Cameron and asked him if he would stay awhile, but Cameron said he had a heavy date; that he could not recall the defendant saying anything to Cameron; that the defendant did not know what he (Freeze) had and had no interest in the drugs.

Owens, also a defense witness, substantially corroborated Freeze, except he said that he remained at the restaurant while the defendant and Freeze were gone to the latter's home. He said that when they returned, he and Cameron got into the rear seat of the defendant's car and Freeze got into the front seat and handed a plastic bag to Cameron and asked him if he had time to smoke; that Cameron said his girl friend was waiting for him and left; that this transaction lasted two or three minutes, he saw no money pass, and the defendant said nothing; and that no cars were parked to the right side of the defendant's car and the one parked on the left was empty.

■ Considered in the light of the well-known rules governing appellate review of the evidence when its sufficiency is challenged upon appeal in a criminal case, Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135, in our judgment it warrants and supports the jury's verdict. Upon this record, the jury could very well have found, as it evidently did, that the defendant assisted in the sale of the marijuana by transporting Freeze to his home and back to obtain it, well knowing what it was and fully aware of Freeze's intent to sell it to Cameron.

By his second and third Assignments of Error, the defendant urges the insistence, advanced in his motion for a new trial, that the trial court erred in sustaining the prosecution's objections to his cross-examination of Cameron. Defense counsel undertook to test Cameron's memory and impeach him by interrogating him on cross-examination as to whether, during the trial of Freeze, he testified concerning whether the defendant made any statements to him, or heard his conversations with Freeze, during the same marijuana-buying transaction. Sustaining the Assistant District Attorney General's objections that defense counsel's questions were not in proper form, the court held that the witness should be asked whether specific questions were put to him during the former trial

and whether he gave certain answers thereto. The court said: "He can state what question was put to the witness and what answer was given and the witness can testify whether he recalls the statement and answer. That's the classic form, so long as he puts it that way."

■ In order to impeach a witness by proving that he made statements out of court contrary to what he has testified in court, the time, place and person to whom the declarations were made must be stated. Cole v. State, 65 Tenn. 239; Moore v. Bettis, 30 Tenn. 67. It is first necessary to call his attention to the alleged conversations or statements, and to ask him if he had such conversations or made the specific statements sought to be proved. Moore v. Bettis, supra.

■ This rule is based upon a sense of justice to the witness, as his veracity should not be impugned in this manner until his attention is called to the subject of the supposed contradictory statements, so that he may have an opportunity to recollect the facts, and correct the statements made, if he is convinced they are wrong, as well as to explain the nature, circumstances, meaning and design, of what may be proved to have been said elsewhere. Bounds v. Schwab, 37 Tenn. 591; Nelson v. State, 32 Tenn. 237.

"It is not enough to ask him the general question, whether he has ever said so and so, nor whether he has always told the same story, because it may frequently happen, that, upon the general question, he may not remember whether he has so said; whereas, when his attention is challenged to particular circumstances and occasions, he may recollect and explain what he has formerly said." Witt v. Haun, 48 Tenn. 160.

In Cole v. State, supra, the Court said:

"Where it is intended to impeach the witness by proving that he made statements out of court contrary to what he has testified in court, the witness should be asked whether he said or declared that which it is proposed to prove by the impeaching witness, that he did say or declare, and the time and place and person to whom the declaration was made should also be stated in the question: 1 Gr.Ev., sec. 462 and note 1; Starkie on Ev., marg. pp. 239–40 and notes; 2 Swan, 259.

"The object of the question is to contradict him, and it is but fair to the witness to refresh his recollection as to the declaration or words used and proposed to be proved, and also by stating time, place and other circumstances calculated to refresh his memory."

■ To contradict a witness by evidence of what he said out of court to other persons on the same subject, contradictory of what he afterwards testified in court, it is essential that the words used *or their substance* be stated to him to refresh his memory and to enable him to reply intelligently. Cole v. State, supra; Middle Tennessee Railroad Company v. McMillan, 134 Tenn. 490, 184 S.W. 20.

Such is the law generally. In 4 Jones on Evidence (Sixth Edition), § 26:3, it is said:

"The procedure to be followed in impeaching a witness by proof of contradictory statements has been explained by a celebrated text writer as follows: 'Every witness under cross-examination in any proceeding, civil or criminal, may be asked whether he has made any former statement relative to the subject matter of the action and inconsistent with his present testimony, the circumstances of the supposed statement being referred to sufficiently to designate the particular occasion, and, if he does not distinctly admit that he has made such a statement, proof may be given that he did in fact make it.'

"While some of the authorities hold that a foundation for impeachment in this

manner need not be established, a majority of the courts hold that a foundation is essential and that the correct procedure is that which is above noted.

\*　　\*　　\*　　\*　　\*　　\*

"For the purpose of identifying the statement which is inconsistent with the witness' testimony, the attention of the witness msut [sic] be called to the person to whom it was made and the circumstances of time and place.

"Declarations to which the attention of the witness has not been called cannot be received in evidence under the prevailing rule.

"While the attention of the witness should be called to the time of the alleged statement, exact precision in this regard is not necessary. It suffices if there is reasonable certainty or if it is clear that the attention of the witness has been called to the conversation in such manner that it has been identified by him.

"If the circumstances stated in the question are such as to describe the occasion with reasonable certainty, an unsubstantial variance as to the time is immaterial. Similarly, if the question designates the person or the place with reasonable certainty, it is sufficient.

"It is not necessary, in laying the foundation, to give the exact language of the alleged statement; the substance is sufficient."

In 3 Wharton's Criminal Evidence (12th Edition), § 918, the author discusses the sufficiency of the required foundation:

"The foundation required for impeachment consists of calling the witness' attention to the alleged prior inconsistent statement, the time and place of its making, and the persons involved, and asking him whether he ever made such a statement. The foundation must be specific as to the time and place and the person to whom the witness made the statement and as to the exact words or the substance of the words of the prior statement. The rule is a flexible one, and its object is merely to prevent the witness from being taken by surprise and to afford him an opportunity to deny having made the statement or to explain it if it is possible."

The fact that the alleged conflicting statements were made in a judicial proceeding, does not vary the application of the relevant legal principles. Bounds v. Schwab, supra.

■ Absent a proper foundation for impeachment, it is not error to exclude evidence of inconsistent statements made by the witness. Hardin v. State, 210 Tenn. 116, 355 S.W.2d 105.

In the case before us, it appears that the testimony in Freeze's trial had not been transcribed. Thus, it was impossible for defense counsel to comply with the court's ruling that, in order to impeach Cameron, the pertinent questions propounded to him and his answers thereto in the Freeze trial would have to be read to him. Clearly, the trial court's rigid requirement that defense counsel would have to state the questions asked Cameron and his answers at the former trial in their exact words exceeded the requirement of the law that it is sufficient to direct the attention of the witness to the *substance* of the purported words.

■ However, in our opinion the trial judge's incorrect ruling wrought no prejudice to the defendant, for a very plain reason. Defense counsel's manifest primary concern in undertaking to cross-examine Cameron with reference to questions propounded to him and his answers in Freeze's trial, was whether he said at that time that the defendant did not hear his conversation with Freeze in the restaurant. In the course of defense counsel's cross-examination of Cameron, the following questions and answers appear:

"MR. BURROW: All right. On the occasion when you testified here in the case against Randy Freeze, of this same transaction, in this Court, didn't you state

that you was sitting at a table with this young lady and that you talked to Freeze at his table?

A   Yes.

Q   And didn't you further state that in your opinion these other two boys didn't hear the conversation?

A   No sir, I don't recall that."

And Cameron also testified upon cross-examination that:

"Q   And what took place now; let's hear that again, when they come in.  Did they come in and sit down and order a beer?

A   They came in and sat down at the table next to mine.

Q   All right, what happened then?

A   They ordered their beer.

Q   Yeah.  .  .  .  .

A   And I started talking to Mr. Freeze.

Q   Did you get up or did you stay at your table?

A   I stayed at my table.

Q   And you didn't get up and walk over to their table?

A   No sir.

Q   All right.  And what did you  .  .  . well, no  .  .  .  they've objected to that.  Anyways, you was talking to him. Were you talking loud or talking low?

A   Just normal conversation."

So, defense counsel substantially accomplished the purpose of his cross-examination of Cameron concerning his testimony at the Freeze trial, and then he offered no evidence to rebut Cameron's unimpeaching answers.

Affirmed.

WALKER, P. J., and DWYER, J., concur.