**STATE of Tennessee, Appellee,**

v.

**Gregory McDOUGLE, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

Aug. 9, 1984.

Brett B. Stein, Jerry A. Schatz, Memphis, for appellant.

William M. Leech, Jr., Atty. Gen., Raymond S. Leathers, Asst. Atty. Gen., Nashville, Phillip G. Harris, Asst. Dist. Atty., Memphis, for appellee.

## OPINION

TATUM, Judge.

The defendant, Gregory McDougle, was convicted of aggravated rape, possession of a firearm with altered or defaced serial number, and carrying a pistol with intent to go armed. He was sentenced to serve 20 years in the State penitentiary for aggravated rape and to six months in the County Workhouse for each of the other two offenses. On this appeal, he does not attack the sufficiency of the evidence but presents several issues on other grounds. After considering the issues, we conclude that the judgments of the trial court must be affirmed.

The defendant first says that the trial court erred in not suppressing the identification evidence of the victim. The trial judge conducted a pretrial hearing on the defendant's motion to suppress. The victim, Dorothy Spearman, testified that on June 26, 1982, she left her home in Memphis at approximately 5:30 A.M. to walk one mile to her employment at a doctor's office. As she walked across the grounds of a school, she was accosted by the defendant. He was approximately 5 feet 2 or 3 inches tall, weighed 135 to 140 pounds, was wearing blue work pants, a tank top and had a pair of white mesh panties on his face. He was black, had nappy hair and an extremely dark complexion.

The witness described the lighting conditions as being good. It was dawn, the sun was coming up and it was between daylight and dark. It was light enough for her to identify a pistol that the man pointed at her. The pistol was a nickle-plated automatic with red paint on the side. The defendant ordered the victim into a utility building and directed her to remove her clothes. She had a lengthy conversation with the defendant and kept addressing him as "son" and reminding him that she was old enough to be his mother. The defendant forced the victim to perform oral sex while on her knees. The defendant told her that he knew where she worked and would "get her" if she notified the police. Notwithstanding these threats, the victim telephoned the police and also told her son, Frederick Spearman, of the outrage.

On July 2, 1982, Frederick Spearman came to the doctor's office where the victim was employed and told her that he had seen a man who fit the description of the rapist put a gun on a young girl in the park or schoolground where the victim was raped. They drove to the area. Frederick went between two buildings, leaving the victim in their car. As Frederick came from behind the building, the defendant and a young girl also came out. The young girl's face was bloody and she was adjusting her clothes. Mrs. Spearman attempted to convince her to get in the car but the girl walked away.

Mrs. Spearman immediately recognized the defendant as the rapist. He was wearing a tank top and gray jogging pants. She recognized his hair and the texture and color of his skin.

The victim telephoned the police while Frederick remained in the car watching the

defendant. Later, she saw that officers were gathered at Church's Fried Chicken establishment and went there. She observed the defendant in a police car approximately three car lengths away. The police did not direct her attention to the defendant or ask for an identification but she informed the police "that's him." This occurred about 15 or 20 minutes after she telephoned the police. The police did not instruct her to go to Church's Fried Chicken.

She recognized the defendant's voice as being one that she had heard before in her office. She checked her office records and found that the defendant had been a patient there.

Frederick Spearman's testimony corroborated that of his mother as to the events that took place on July 2, 1982. When he went between the two buildings and observed the defendant raping the young girl, the defendant looked surprised and jumped up. The girl was lying under the defendant looking "scared." Frederick observed the defendant walk across the park into Church's Chicken. The defendant left there with a cold drink and disappeared behind a hardware store. When the police arrived, he described the defendant to them and waited at Church's.

The officers·observed the defendant on the street wearing clothes that had been described to them by Frederick Spearman. He was carrying a drink cup in his hand. He was searched and a small caliber chrome-plated pistol with red paint on the side was found. The victim positively identified this pistol as the one used by the man who raped her. None of the officers asked anyone to identify the defendant. When the officers returned to Church's Fried Chicken, they went there to receive instructions from their lieutenant. They did not know that Mrs. Spearman would be there. When the defendant was searched at the jail, a pair of mesh panties was found "balled" up in his underwear.

In his attack on the identification evidence, the defendant says:

"The first issue that this court must consider is whether or not the officer's conduct of bringing the appellant back to the scene of the crime was unduly suggestive; secondly, if such procedure was so unduly suggestive, whether or not under the totality of circumstances, the identification was reliable even though the confrontation procedure was unreliable.

The officers did not return the defendant to the scene of the crime after his arrest. He was taken to Church's Chicken establishment where the arresting officers were to meet their lieutenant for instructions on what charges to bring. The victim's son was also known by the officers to be there.

■ We do not find that the identification procedure was unduly suggestive. In *Rippy v. State*, 550 S.W.2d 636 (Tenn. 1977), our Supreme Court, citing cases of the United States Supreme Court, observed that the federal cases spoke in terms of "the degree of suggestion inherent in the manner in which the *prosecution* presents the suspect to witnesses for pretrial identification." No police officer nor anyone connected with the prosecution presented the defendant to the victim for pretrial identification. While at Church's Fried Chicken, she observed the defendant and identified him spontaneously of her own volition. The officers did not ask for an identification nor did they know that the victim would be at the establishment when they brought the defendant there. See *Marsh v. State*, 561 S.W.2d 767 (Tenn.Crim. App.1977); *Kelley v. State*, 478 S.W.2d 73 (Tenn.Crim.App.1972).

■ Even if the officers had planned the confrontation, it would not have been unconstitutionally suggestive. The victim had observed the defendant 15 or 20 minutes before he was returned to Church's Fried Chicken. Although the victim was raped a few days before, the rationale is the same in this case as in those cases holding that an "on the scene investigatory procedure, instituted shortly after the offense occurred" is not an unconstitutional identification. See *State v. Foote*, 631

S.W.2d 470 (Tenn.Crim.App.1982); *Johnson v. State*, 596 S.W.2d 97 (Tenn.Crim. App.1979). Moreover, the record is clear that the victim's in-court identification of the defendant was based upon her observations made when the crime was committed and not upon observations made July 2, 1982. This issue is without merit.

In the next issue, the defendant says:

> "The court committed prejudicial error in repeatedly refusing defendant's request made during cross examination of State's witnesses, Dorothy Spearman and Frederick Spearman, that the official court reporter be allowed to read back specific questions asked of and answers given by said State's witnesses during earlier testimony for purpose of impeachment."

In cross examination of the victim in the presence of the jury, defense counsel wanted to interrupt the cross examination of Mrs. Spearman while the court reporter searched for and read previous testimony of Mrs. Spearman. The previous testimony, which was alleged to have been inconsistent, was given by the witness in the presence of the jury. The trial judge committed no error in refusing to permit the court reporter to read testimony of the witness which had already been heard by the jury.

In other instances the defendant desired to interrupt his cross examination of the victim and her son while the court reporter read to the jury alleged inconsistent testimony of the witnesses given at a jury-out hearing.

There is no precedent for the interruption of the examination of a witness to enable the court reporter, or any other witness, to testify as to inconsistent statements by a witness on the stand. The proper procedure is discussed in *James v. State*, 506 S.W.2d 797 (Tenn.Crim.App. 1973). If the witnesses gave testimony at a jury-out hearing which was inconsistent with their testimony before the jury, the proper procedure was for the defendant to introduce the court reporter as a witness as part of the defense proof. Only chaos could result from a practice of permitting the testimony of one witness to be repeatedly interrupted to permit another witness to testify concerning prior statements of the witness being examined. We refuse to adopt such procedure.

In the next issue, the defendant says that the court erred by refusing to allow testimony of Officer Douglas "concerning the affidavit of complaint filed in this cause." The affidavit was signed and sworn to by Officer J.R. Hudson. It stated in pertinent part:

> "She (Dorothy Spearman) and her son were walking by this park on 7/2/82 and observed Gregory McDougle in the process of raping a female black."

The victim and her son both testified that the son was driving to the victim's place of employment on June 2, 1982 when he observed the defendant struggling with an unknown black female. He went to the doctor's office, got his mother and drove back to the school ground. Defense counsel announced to the court that Officer J.R. Hudson, who made the affidavit, would testify that Officer J.D. Douglas actually wrote the affidavit although it was signed by him (Hudson).

Officer Douglas testified out of the presence of the jury. It is apparent that his memory as to the source of the facts placed in the affidavit is very vague. He testified that he was temporarily assigned to the case after the defendant's arrest for the purpose of locating the young girl whom the defendant allegedly raped on July 2. In connection with this investigation, he talked with the victim about three times over the telephone. He obtained the information placed in the affidavit from statements previously taken by other officers at the time the victim was raped, from offense reports and the telephone conversations that he had with the victim. He made no notes of the telephone conversations with the victim but he "believed" that she told him that her son walked by the school grounds on his way to get his mother at her place of employment on July 2. After the son walked to his mother's place of

employment, he and his mother walked back to the park on their way home, he "believed."

The affidavit itself was useless for impeachment purposes. It was based upon information obtained by Officer Douglas from offense reports made by other officers and statements given to other officers, as well as his recollection of the telephone conversations. The affidavit was never shown to either the victim or her son and was not adopted by them. According to Officer Douglas's testimony, the victim did not tell him that she and her son were walking by the park and observed the defendant in the process of raping a female black. According to his testimony, he "believed" that the victim told him that the son walked by the park on his way to get his mother when he observed the struggle. He "believed" that after the son had gotten the mother at her place of employment, they walked back to the park. The affidavit does not conform to what the officer testified the victim told him.

Defendant says that the evidence of the officer that the victim and her son were walking on July 2 instead of riding in a car was exculpatory. We disagree. Whether the victim and her son were riding or walking on July 2 has no bearing on the defendant's guilt.

The defendant argues that the testimony of the officer was admissible as showing a prior inconsistent statement. The evidence from the officer that he believed the victim told him that they were walking and not riding is not admissible as a prior inconsistent statement. No foundation was laid by asking either the victim or her son whether they told Officer Douglas that they were walking and not riding. This foundation is essential before evidence of an impeaching statement can be admitted. *James v. State, supra.* Moreover, whether the victim and her son were riding or walking on July 2, 1982, is a collateral matter; hence, Officer Douglas's testimony was not admissible for this reason. See *State v. Hill,* 598 S.W.2d 815 (Tenn.Crim.

App.1980); *Honeycutt v. State,* 544 S.W.2d 912 (Tenn.Crim.App.1976).

Finally, due to the obvious vagueness of Officer Douglas's memory of his conversations with the victim, we are convinced that the exclusion of his testimony did not affect the result of the trial. The officer's testimony was weak and uncertain.

The defendant next complains of the following argument by the State:

"The nude girl. I am glad to hear now that this was a voluntary sex act. That doesn't make any sense. If it had been, Mr. Stein and Mr. Schatz would have subpoenaed her to court..."

The above argument was made in response to argument by defense counsel that the defendant and the young girl were voluntarily having sex on the school grounds on July 2, 1982. He argued that the blood on the girl's face was the product of "the power of suggestion." Defense counsel also observed that the State did not subpoena the girl.

Defendant cites *Delk v. State,* 590 S.W.2d 435 (Tenn.1979) for the proposition that before the missing witness argument can be made, the evidence must show, among other things, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party. If the defendant and the missing witness were voluntarily engaged in the sex act and the missing witness gave the defendant her panties, as argued by the defendant, this would evince a relationship that would naturally incline the girl to favor the defendant. This issue is without merit.

The defendant complains in two other issues of the following final argument by the Assistant District Attorney:

"I want you to go back there and think about punishment. I want you to think about a person in our community who subjects a woman to this sort of dehumanization. I submit to you that no punishment is too great. Is that harsh? I submit to you it's not because the gra-

vamen of this offense, the fact that this is a dehumanization of her self-concept, how she feels about herself, to know that she's been made to sit there and do that. That puts a load on her.

My point is simply this; the gravamen of this offense is the psychological rend that has been taken upon her, her psyche has been rent or torn apart, however you would like to say it. I told you we didn't want any sympathy for her and we don't. Save your postage on your sympathy cards. She doesn't need it. But you'd better be thinking about what you're going to do with somebody who would do this. You'd better be thinking about it.

What he has done is desensitized sex to her."

■ The defendant first states that it was reversible error for the Assistant District Attorney to say, "I want you to go back there to think about punishment." The defendant says that he did not argue punishment and therefore this statement should not have been made in closing argument. The State did not recommend any specific punishment. The statement complained of was inocuous and without effect.

■ With respect to the portion of the argument that rape is dehumanizing and affects one's self-esteem, the defendant says that this is not supported by the evidence. We disagree. We think that the act of forcing a woman to get on her knees and perform oral sex on a man is inherently dehumanizing and lowers her self-concept. We think that this is generally known by common experience and understanding. It is not error for the prosecuting attorney to argue that which is warranted by reasonable inferences from the evidence adduced at trial. *State v. Sutton,* 562 S.W.2d 820 (Tenn.1978).

■ Our courts give wide latitude to counsel in arguing their position in a case to the jury and the control of final argument is a matter left to the sound discretion of the trial judge. An appellate court will not reverse absent an abuse of discretion. *State v. Sutton, supra; Smith v.*

*State,* 527 S.W.2d 737 (Tenn.1975). We find no abuse of discretion in the controlling of final argument in this case.

■ The defendant next complains that the mesh panties found on him immediately before he was placed in jail was unlawfully admitted into evidence. He says that a warrant was necessary to search the defendant after he was arrested and transported to jail. We think that this question was correctly disposed of in *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974). The court said:

"It is also plain that searched and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention."

We find no reversible error and affirm the judgments of conviction.

DAUGHTREY and SCOTT, JJ., concur.