IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 14, 2009

## LAMAR ROSS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-08113     James M. Lammey, Jr., Judge**

---

**No. W2008-01130-CCA-R3-PC  - Filed August 20, 2009**

---

The petitioner, Lamar Ross, appeals from the post-conviction court's denial of post-conviction relief as it relates to the petitioner's convictions on two counts of aggravated rape, which were merged into a single judgment of conviction by the trial court and modified on direct appeal. On appeal from the judgment of the post-conviction court, the petitioner asserts that trial counsel was ineffective and that he was thereby prejudiced. Following our review of the record and the parties' briefs, we affirm the judgment of the post-conviction court denying post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Deena L. Knopf, Memphis, Tennessee, for the appellant, Lamar Ross.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Zak, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Background

The petitioner was indicted on two counts of aggravated rape, Class A felonies. Following a jury trial, he was convicted on both counts and they were merged into a single judgment of conviction. The petitioner was sentenced by the trial court as a Range I, violent offender to twenty-four years in the Tennessee Department of Correction. On direct appeal, this court modified the conviction in Count II to rape, a Class B felony, concluded that two of the four enhancement factors utilized by the trial court were inapplicable, and reduced the petitioner's sentence to twenty-two years in the Tennessee Department of Correction. *See State v. Lamar Ross*, No. W2003-02823-CCA-R3-CD, 2004 WL 2715348 (Tenn. Crim. App., at Jackson, Nov. 22, 2004), *perm. app. denied* (Tenn. May 31, 2005). The following is a summary of the facts of the case taken from this court's opinion on direct appeal:

The victim in this case, J.F., FN1 is a resident of the Barry Homes, a Memphis public housing development reserved for the physically and mentally disabled. At approximately 11:50 p.m. on July 1, 2002, the victim reported to Carolyn Delbridge, a Memphis Housing Authority criminal investigator assigned to the building, that earlier in the day a man had enticed him into walking with him to a nearby abandoned public housing complex, where he had forced the victim at knifepoint to perform oral sex and had penetrated him anally with his penis. From the victim's description, Delbridge recognized the defendant, who was a regular visitor in the Barry Homes, and whom she had seen in the building earlier that afternoon.

> FN1. It is the policy of this court to identify victims of sexual assault by their initials only.

The victim subsequently led Delbridge, her supervisor, and a group of Memphis police officers to the abandoned housing complex and pointed out the room in which the rape occurred. There, the officers discovered the defendant asleep on the floor, a gray knife matching the victim's description of the weapon used in the attack underneath a blanket beside his left hand. In addition, the victim immediately identified the defendant as the perpetrator when the officers removed him from the room. As a result, the defendant was arrested and charged with two counts of aggravated rape, based on his use of a weapon in the attack and his rape of a victim he knew or had reason to know was mentally defective.

At the defendant's September 22-24, 2003, trial, the victim testified he was forty-one years old and had lived in the Barry Homes Housing Development in downtown Memphis for the past two years and four months. He said he was sitting outside the building on July 1, 2002, when a man dressed in blue jeans and a black shirt with a black design approached and asked him to accompany him to where he was living, saying something about wanting to show the victim a "cat hole" and also about having the victim play basketball with him. The victim said he declined, but the man grabbed him by the arm and told him to come with him, repeating that he had something to show him. As they walked together down the street, the man introduced himself to the victim as "Lamar Ross."

After leading the victim into an upstairs vacant room inside the nearby abandoned Lauderdale Court housing project, the man suddenly pulled down his clothes, telling the protesting victim that he had to "do [his] job." The victim said he refused and tried to leave, but the man grabbed him by the neck, pulled out a gray knife, and threatened that he would be "a dead sucker" if he did not "suck his penis." Because he was afraid the man would hurt him, the victim complied. He said that afterwards, the man forced him to lower his pants and then penetrated his rectum with his penis four times, which hurt him. When finished, the man forced him to wait and walk back toward the Barry Homes complex with him, threatening that the victim was "gonna get [his] butt kicked again" if he refused.

-2-

The victim testified that when he returned home he first related the incident to the manager of his building, who refused to help, and later to Ms. Delbridge, the building's security officer, who called her supervisor and the police. After describing the rapist, he led officers to the abandoned housing complex, where the police discovered a man fitting the rapist's description asleep in the room where the incident occurred. The victim testified he immediately recognized and identified the man as the perpetrator when the police brought him out of the room. However, the victim was unable to identify the defendant at trial.

On cross-examination, the victim testified he completed the eleventh grade but did not graduate. He was unsure of the exact time the incident occurred, but was confident it was before dark. He was also confident that the defendant told him his name was "Lamar Ross." He acknowledged he had reported the time of the incident as 4:00 p.m. in his statement to police, and had said that Ms. Delbridge told him the perpetrator's name was Lamar. He testified he described the perpetrator as a tan or "khaki-skinned" man with facial hair, shorter than he was, and dressed in blue jeans, a black shirt, and white tennis shoes. The victim said he did not think the defendant had been wearing a condom, and he did not ejaculate in his mouth. He denied having told anyone that the defendant ejaculated, but said he had mentioned that he saw "some white stuff caked around [the defendant's] penis," which had an "ill smell to it." The victim acknowledged he told police that he was 5' 6" and thought his assailant was six feet tall. He was unable to say whether six feet was taller than his height, but indicated that the man who raped him came up to his ear. On redirect, he affirmed that he had been able to point out the defendant to the judge in an earlier court proceeding in the case.

Carolyn Delbridge testified she was working at the Barry Homes as a criminal investigator for the Memphis Housing Authority on July 1, 2002, when the "crying-shaken-real distraught" victim came to her at 11:50 p.m. and reported that "somebody made him put their nasty thing in his mouth." She said the victim related that he had been sitting on the stoop when a man wearing dark jeans, a black long-sleeved shirt with white writing on it, and white tennis shoes asked him for a beer. The victim told her that he refused to buy him a beer, and the man asked him to accompany him to the store. However, when they reached the abandoned Lauderdale Court Apartments, the man "pushed . . . and shoved him" inside an apartment, pulled a gray knife, forced him to go upstairs into a room with a folded blanket on the floor and a pink candle in the window, and then made him perform oral sex and anally penetrated him. Delbridge stated that the victim did not know what a condom was, but answered in the affirmative when she asked if he had been wet where the man penetrated him. She agreed that the victim was mentally disabled, or "a little slow."

Delbridge testified that the victim led her, her supervisor, and several Memphis police officers to the apartment, where they found the defendant asleep on

some folded blankets on the floor. She said the victim had previously described the perpetrator's foot odor, and she and the other officers were able to smell the defendant's feet "as soon as [they] hit that bedroom." She confirmed that the victim identified the defendant as his rapist at the scene, and testified that a gray knife was discovered near the defendant's left hand on the floor under a blanket. On cross-examination, Delbridge testified that the defendant checked into the Barry Homes for a visit at 5:00 p.m. and left around 5:30 or 5:40 p.m. She said the victim told her that the rape occurred between 8:00 and 8:30 p.m. She acknowledged she recognized the defendant from the victim's initial description of his rapist, but was confident she did not tell the victim his name. On redirect, she testified she recognized the defendant from the victim's description of his perpetrator's bad case of acne and his clothing.

Memphis Police Officer Christopher Patterson testified that shortly after midnight on July 2, 2002, the victim led him and several other officers to the Lauderdale Court apartment in which the attack had occurred, where they discovered the defendant asleep on the floor. He confirmed that the victim identified the defendant at the scene as the man who had raped him.

Jerry Hamilton testified he was the manager of clinical services for Case Management Incorporated, a private agency that assists clients with mental health problems to locate housing, food, and other resources in order to "make adjustments to the community" and to function as independently as possible. He said that the victim, a client of his company, had been diagnosed with a mood disorder and mental retardation and received a government disability check based on his mental disability.

Darna Davis testified she was a caseworker for Case Management, Inc., and had managed the victim's case since May. She said her understanding was that the victim had been diagnosed with both mental retardation and a mood disorder. She stated that her company managed the victim's money, paid his bills, filled and delivered his monthly prescriptions, and provided transportation for him to and from the clinic. However, the defendant lived on his own at the Barry Homes, was responsible for taking his medication daily, and appeared to her to be able to take care of himself on a daily basis.

Nina Sublette, a nurse practitioner who was accepted by the trial court as an expert in the field of forensic nursing, testified she examined the victim at the Memphis Sexual Assault Resource Center at 2:30 a.m. on July 2, 2002. Although she observed nothing unusual with respect to the victim's mouth and lips, she found four subacute lacerations to his anal verge, or the wrinkled part of his rectum, as well as a larger laceration located outside the anal verge at the "peri-anal skin area." All five lacerations bled easily upon slight manipulation. Sublette opined that the injuries were "very recent," had definitely occurred within the past twenty-four hours and probably within the past twelve, and were consistent with "blunt penetrating trauma." She testified there was no semen detected on the oral or rectal swabs she

collected from the victim or from his underwear. On cross-examination, Sublette testified she had estimated the time of the assault as 4:00 p.m. based on what the victim told her. She acknowledged the victim told her he thought his assailant wore a condom, but could not recall if she had to first explain to him what a condom was.

The defendant elected not to testify and rested his case without presenting any proof. After deliberating, the jury returned guilty verdicts in both counts of the indictment. At the conclusion of the sentencing hearing, the trial court announced that the convictions would be merged into a single judgment of conviction and applied the following enhancement factors to the offense: (2), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; (6), the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; and (7), the personal injuries inflicted upon the victim were particularly great. Tenn. Code Ann. § 40-35-114(2), (6), (7) (2003). Without specifying which, the trial court also found that because of the alternate theories under which the defendant had been convicted of the two separate counts, which had merged, either enhancement factor (5), the victim was particularly vulnerable because of age or physical or mental disability, or enhancement factor (10), the defendant possessed or employed a deadly weapon during the commission of the offense, applied. *See id.* § 40-35-114(5), (10). Finding no mitigating factors applicable, the trial court enhanced the defendant's sentence from the presumptive midpoint of twenty years for a Range I offender convicted of a Class A felony to twenty-four years.

*Lamar Ross,* 2004 WL 2715348, at *1-4. The petitioner filed a timely pro se petition for post-conviction relief. Thereafter, post-conviction counsel was appointed, an amended petition was filed, and an evidentiary hearing was held. At the hearing, the following pertinent testimony was presented. The petitioner testified that in October of 2002, he entered a plea of "not guilty" and trial counsel was appointed to represent him on charges of aggravated rape. According to the petitioner, trial counsel met with him only one time prior to trial. He stated that while he was in jail awaiting trial, he received the state's discovery package, however, he claimed that trial counsel did not meet with him to review the package. The petitioner denied that he spoke with trial counsel regarding an investigation of the case or potential trial witnesses. On the day of trial, counsel relayed a plea offer made by the state.

Regarding the underlying facts of the case, the petitioner testified that since 1992, he had frequently gone to Barry Homes to visit a friend. On the day of the incident, the petitioner signed into Barry Homes at 5:00 p.m. and signed out at 5:20 p.m. A surveillance camera located outside the entrance at Barry Homes would have verified his arrival and departure times. He stated that he did not ask trial counsel to obtain tapes from the surveillance camera. The petitioner denied that he saw or talked to the victim prior to July 2, 2002, the day of his arrest. At the time of his arrest, the petitioner was living on the street. He stated that he had passed out in a vacant apartment in Lauderdale Court, an abandoned public housing complex. The police awoke him, searched him, and handcuffed him. The petitioner stated that he was taken outside of the building in handcuffs, and he saw the victim standing on the sidewalk. One of the officers asked the victim, "if this was the

man." The victim first said that the petitioner looked like his attacker, but then made a definite identification.

The petitioner stated that the victim did not initially identify him at the preliminary hearing and did not identify him at trial. On cross-examination, the petitioner agreed that there were a number of inmates present in the courtroom at his preliminary hearing. He further agreed that at one point during the hearing, the victim identified him as his attacker. The petitioner stated that when he was arrested, he wore a long sleeve black shirt, blue jeans, and white tennis shoes. He agreed that at the time of his arrest, his clothes and bedding matched the victim's description of the clothes and bedding of his attacker.

Vertie McNeil, sergeant with the Memphis Police Department, testified that she was involved in the investigation of the case and identified statements she took from the victim and the petitioner. According to the victim's statement, he was attacked at approximately 4:00 p.m. on July 1. On cross-examination, Sergeant McNeil stated that the victim said that his attacker had black hair and tan skin and was wearing blue jeans, a black shirt, and white tennis shoes. According to the victim, his attacker was shorter than his own height, five feet, six inches, and he was in his 30's or 40's. When Sergeant McNeil asked the victim if he knew his attacker, he stated, "I would have known him by his face[.]" Sergeant McNeil stated that she asked the petitioner about the attack and he denied any knowledge or involvement. She stated that she was not subpoenaed to trial and did not testify.

Sharonda Hampton, lieutenant with the Memphis Police Department, testified that late on July 1, or early on July 2, 2002, she and several other officers responded to a rape call at Barry Homes. Police officers brought the victim to an abandoned apartment complex and the victim pointed out the apartment where the rape occurred. Lieutenant Hampton participated in a search of the apartment. She stated they found a man asleep on the floor with a knife beside him. The knife matched the victim's description of the knife used by his attacker. The suspect was handcuffed and brought out of the building "to see if the victim, . . .could identify him." Lieutenant Hampton said she did not speak to the victim, however, according to the other officers, the victim identified the suspect as his attacker. Lieutenant Hampton testified that she did not hear any of the police officers suggest to the victim that the suspect was his attacker. On cross-examination, Lieutenant Hampton confirmed that the suspect found in the building matched the physical description given by the victim, and he was wearing clothing that matched the victim's description of the attacker's clothes.

Trial counsel testified that on October 29, 2002, the petitioner was arraigned and she was appointed to represent him. Counsel stated that she spoke to the petitioner on October 29th, at three subsequent court appearances and on the first day of trial. Counsel said that she did not visit the petitioner in jail, however, she explained, "at that time we were having problems getting people down to the jail and so we would talk to people in court." Counsel stated she received discovery from the state and sent a copy of the package to the petitioner. She discussed the state's discovery package with the petitioner. She and the petitioner also discussed potential witnesses for trial. The petitioner did not ask her to contact any witnesses and did not request that she obtain surveillance tapes. Counsel obtained the petitioner's file from the attorney who had represented him in General Sessions Court. It was counsel's understanding that the petitioner wanted to proceed on the defense that the victim identified the wrong person. Counsel was aware that at the time the petitioner was

found by police, he was brought out of the building in handcuffs before the victim identified him. However, she did not file a motion to suppress the identification. Regarding a note in counsel's file referring to Dr. Sandra Bolts, counsel explained that she considered having Dr. Bolts testify regarding the victim's mental condition, but decided against it. She thought that the proof at trial showed that the victim could take care of himself and that such proof was beneficial to the petitioner. Counsel stated that she did not want to do anything to make the victim appear unaware of his surroundings or unable to identify his attacker.

Counsel testified that her notes from trial indicated that Mr. Hamilton testified that the victim had a mood disorder, but was stabilized. Ms. Davis testified that she saw the victim once a month to insure everything was going all right. According to Ms. Davis, the victim gave himself his own medicine, prepared his own food, and took care of himself. Referring to a trial transcript, counsel stated that the prosecutor asked Ms. Davis if it was her understanding that the victim "has both a mood disorder and he's also been diagnosed as mentally retarded[.]" Ms. Davis responded, "yes."

Counsel agreed that the trial court ruled that evidence of the petitioner's prior convictions would not be allowed. According to counsel, her position that the petitioner should not testify was not based on a prior conviction, but on what the petitioner told her before trial.

On cross-examination, counsel stated that the petitioner told her "he had been drinking, he was passed out, he woke up, his pants had been pulled down and [the victim] had impaled himself on [the petitioner's] erect penis." The petitioner had previously told counsel that he knew nothing about the rape or the victim. The petitioner told the attorney who represented him in General Sessions Court that he was on crack and had been up for three or four days when he went to Barry Homes to visit his friend. He told his former attorney that he only remembered leaving Barry Homes and that the victim began walking with him. The next thing he knew, he awoke with the victim on top of him.

Counsel stated that in preparing for trial, she spoke with the petitioner and all of the witnesses that she was able to interview. Counsel testified that she also reviewed a transcript of the preliminary hearing and confirmed that the victim had identified the petitioner at the hearing. Counsel spoke with the attorney who had represented the petitioner in General Sessions Court and learned that the victim had been a good witness. Counsel stated that an investigator contacted Sergeant McNeil at Juvenile Court and told her he was bringing over a subpoena for trial. When the investigator arrived, Sergeant McNeil was no longer at Juvenile Court. The investigator left the subpoena with Terry Fratesi, an assistant district attorney. Counsel stated that Officer Delbridge identified the petitioner at trial. Counsel did not pursue the issue of the identification of the petitioner because the state had not mentioned that the victim identified the petitioner at the preliminary hearing. She did not want to bring up a prior identification. After taking the matter under advisement, the post-conviction court entered an order denying the petition for post-conviction relief. The petitioner has appealed.

Analysis

On appeal, the petitioner asserts that trial counsel was ineffective.[1] Specifically, he argues that trial counsel was deficient in failing to file a motion to suppress the victim's initial identification of the petitioner as his attacker. The petitioner also asserts that counsel was deficient in failing to object to lay testimony concerning the victim's decreased mental capacity.

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is *de novo* with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

In order to establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id.* at 697. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.*

## I. The victim's identification of the petitioner

---

[1] In his petition and at the hearing, the petitioner argued that his claim of ineffective assistance of counsel was supported by a number of grounds that he has abandoned on appeal. Since our review generally does not extend to issues not presented for review, we decline to address arguments in support of the petitioner's claim of ineffective assistance of counsel pursued below but not presented to this court for review. *See* Tenn. R. App. P. 13(b).

On appeal, the petitioner asserts that trial counsel was deficient in her representation by failing to file a motion to suppress the victim's initial identification of the petitioner. He argues that the victim's "show-up" identification of him was unreliable and made under suggestive circumstances. He asserts that trial counsel should have moved to suppress the identification made while he was in handcuffs and surrounded by police officers. The petitioner also asserts that the victim's alleged mental incapacity rendered the identification unreliable. According to the petitioner, if trial counsel had filed and argued a motion to suppress the identification, the case against him would have been reduced to purely circumstantial evidence and the likelihood of conviction would have been severely diminished.

On appeal, the petitioner acknowledges the holding in *Sloan v. State*, 584 S.W.2d 461, 466 (Tenn. Crim. App. 1978) for the proposition, "that despite suggestiveness in the procedure employed, an out-of-court identification will withstand a due process attack if the identification itself is reliable in evaluating the totality of the circumstances." In *Sloan*, the court recognized that a violation of due process had occurred when the "identification procedure was so suggestive as to give rise to 'a very substantial likelihood of irreparable misidentification.'" (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The reliability of an identification should "be assessed in light of the suggestiveness of the identification procedure and the totality of the circumstances to determine whether a violation of due process has occurred." *See id*. (citing *Proctor v. State*, 565 S.W.2d 909, 911-912 (Tenn. Crim. App. 1978)). Factors to be considered in evaluating the reliability of an identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See id*. (citing *Proctor*, 565 S.W.2d at 911-912 (quoting *Neil v. Biggers*, 409 U.S. 188, 199 (1972))); *see also State v. Vidal L. Strickland*, No. M2002-01714-CCA-R3-CD, 2003 WL 22243440, at *12 (Tenn. Crim. App., at Jackson, Sept. 30, 2003), *perm. app. denied* (Tenn. Oct. 17, 2005) (citing *Biggers*, 409 U.S. 188, 199)).

Tennessee courts have rejected the use of show-up identifications to establish the identity of individuals suspected of a crime unless, "(a) there are imperative circumstances which necessitate a show-up, or (b) the show-up occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." *State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989) (citations omitted). Imperative circumstances include the commission of a serious felony where the perpetrator is still at large. *See Strickland*, 2003 WL 22243440, at *13 (citation omitted). An identification made during a confrontation arranged between a victim and a suspect may be reliable where the identification was part of an on-the-scene investigation and the victim not only identified the suspect, but also gave accurate descriptions of relevant details. *See Kenneth Reeder Isabell v. State,* No. 84-120-III, 1986 WL 1676, at *2 (Tenn. Crim. App., at Nashville, Feb. 4, 1986) (citing *Johnson v. State*, 596 S.W.2d 97 (Tenn. Crim. App. 1979); *State v. McDougle*, 681 S.W.2d 578, 581 (Tenn. Crim. App. 1984)).

In this case, the victim identified the petitioner when he was brought from the building where he was found in handcuffs. "The practice of presenting a handcuffed suspect in a one-on-one confrontation has been condemned." *Strickland*, 2003 WL 22243440, at *13 (citations omitted). However, presenting a suspect in handcuffs does not establish that the show-up identification was

impermissibly suggestive when reliability of the identification may be otherwise established. *See id.* The record reveals that the identification took place within hours of the crime, after the petitioner was found at the location identified by the victim at the crime scene, and in clothes matching the victim's description. Thus, the show-up identification was conducted as part of an on-the-scene investigatory procedure within hours of the crime. In addition, a serious felony had been committed and the armed perpetrator was still at large.

Furthermore, an analysis of the *Biggers* factors supports the conclusion that a substantial danger of misidentification did not exist in this case. *See id.* First, due to the nature of the crime and the amount of time the victim spent with the petitioner, the victim had the opportunity to clearly view his attacker. Second, the victim's description of the petitioner's clothing, hair, and actions reveal a high degree of attention paid by the victim to his assailant. Third, the victim's description matched the appearance of the petitioner at the time of his arrest. Fourth, although the petitioner testified that the victim hesitated in identifying him, Lieutenant Hampton testified at the post conviction hearing that the victim identified the petitioner without assistance. At trial, Officer Patterson verified the victim's identification of the petitioner and the crime scene. Officer Delbridge testified regarding the victim's knowledge of details which led to the discovery of the petitioner. Finally, the identification occurred within hours of the rape. Thus, all five factors support the reliability and accuracy of the identification.

In light of the foregoing, we conclude that the record supports the reliability of the victim's identification of the petitioner. The petitioner has failed to demonstrate that a motion to suppress would have prevailed or that trial counsel was deficient in failing to file the motion. Moreover, in the event that a motion to suppress the identification would have prevailed, it is not likely that the outcome of the trial would have been different. The state may prove its case entirely through circumstantial evidence where facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). At trial, Officer Delbridge testified that the petitioner visited Barry Homes on the day of the rape and that she recognized the petitioner from the victim's initial description of his perpetrator. The petitioner admitted that his clothing and bedding matched the descriptions given by the victim. Lieutenant Hampton testified that a knife matching the victim's description was found next to the petitioner in the apartment identified by the victim as the crime scene. Even without evidence of the victim's identification of the petitioner, there was substantial evidence presented at trial to establish the identity of the petitioner as the victim's attacker. Therefore, the petitioner has failed to show prejudice as a result of trial counsel's failure to file a motion to suppress. Accordingly, we conclude that the record supports the post-conviction court's finding that trial counsel's actions were within an objective reasonable standard. The petitioner is without relief on this issue.

## II. Lay testimony regarding the victim's mental condition

The petitioner also asserts that trial counsel was ineffective in failing to object to lay testimony regarding the victim's diagnoses of a mood disorder and mental retardation. He argues that the testimony of Mr. Hamilton and Ms. Davis regarding the victim's mental condition was offered without a proper foundation. He further asserts that neither Mr. Hamilton nor Ms. Davis

testified to personal knowledge sufficient to justify the jury's consideration of their opinions regarding the victim's mental capacity. The order of the post-conviction court states the following findings:

> Petitioner asserts trial counsel was ineffective for not objecting to witnesses' testimony regarding victim's previous diagnoses. Specifically, Petitioner claims trial counsel should have objected to Darna Davis and Jerry Hamilton's testimonies concerning the victim's mood disorder and mental retardation diagnoses because a proper foundation was not laid nor were the witnesses qualified as experts. Petitioner further contends trial counsel should have proffered evidence rebutting the victim's alleged mental conditions. Both Ms. Davis and Mr. Hamilton testified at trial that they worked for Case Management, Inc. a private organization that aids clients who have mental health problems, which provided the victim assistance and managed his disability income. Based upon the witnesses' testimonies regarding their employer and job duties, the victim's diagnoses were within their personal knowledge to testify about. Therefore, a proper foundation was laid for their testimonies. Petitioner has failed to offer any evidence which trial counsel should have produced at trial to rebut the victim's mental conditions. Furthermore, the Tennessee Criminal Court of Appeals found the evidence of the victim's mental defect "ample." This Court finds that [counsel's] representation did not fall below an objective reasonable standard.

The record does not preponderate against the trial court's findings. Because a proper foundation established that Ms. Davis and Mr. Hamilton could testify regarding the victim's mental condition, any objection to their testimony regarding the victim's diagnoses would have lacked merit. Additionally, as pointed out by the post-conviction court, there was ample proof in the record regarding the victim's mental condition. The victim lived in Barry Homes, a facility reserved for the disabled. His finances were managed and his personal care was monitored by Case Management, Inc. Officer Delbridge testified at trial regarding the victim's diminished mental capacity. We conclude that the petitioner has failed to show that trial counsel was deficient in failing to object to testimony regarding the victim's mental ability. The petitioner has also failed to show that he was prejudiced. The petitioner is without relief on this issue.

### Conclusion

Based on the foregoing, we affirm the judgment of post-conviction court.

_____
J.C. McLIN, JUDGE