IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2025 Session

## STATE OF TENNESSEE v. KIMBERLY M. SMART

**Appeal from the Criminal Court for Hamilton County**
**No. 313010   Boyd M. Patterson, Judge**

---

**No. E2023-01688-CCA-R3-CD**

---

FILED

APR 2 2 2025

Clerk of the Appellate Courts
Rec'd by

The Defendant, Kimberly M. Smart, was convicted by a Hamilton County jury of reckless aggravated assault, for which she received a sentence of three years' incarceration. On appeal, the Defendant argues that (1) the trial court erred in admitting extrinsic evidence of a witness's prior inconsistent statement for impeachment, (2) the trial court erred in admitting a body camera recording depicting the victim shortly after she was stabbed, and (3) the prosecutor committed misconduct by attempting to shift the burden of proof to the Defendant during closing and rebuttal arguments. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

W. MARK WARD, SP. J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Steven E. Smith, District Public Defender; Alex Weill Shoaf, Assistant District Public Defender (at trial and on appeal); and Mike A. Little, Deputy District Public Defender (at trial), for the appellant, Kimberly M. Smart.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Coty Wamp, District Attorney General; Kevin Loper, Executive Assistant District Attorney General; and Michael Dowd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural History

A Hamilton County grand jury charged the Defendant with one count of voluntary manslaughter in relation to the December 17, 2021 stabbing death of the victim, Kristal Reno. Following a pretrial evidentiary hearing, the Defendant's case proceeded to trial on March 21, 2023.

Sergeant Richard Harris of the Collegedale Police Department ("CPD") testified that he received a call notifying him that a stabbing had occurred at a home on Bill Reed Road ("the home") in Ooltewah. Sergeant Harris explained that though Ooltewah is an unincorporated community just outside CPD's jurisdiction, the nature of the call required an immediate response, and as he was the nearest member of law enforcement to the home, he traveled there to "secure the scene" until emergency medical services arrived. Sergeant Harris arrived at the home at 9:40 p.m. and left at approximately 10:20 p.m.

Sergeant Harris described the home as small and skinny, with the front door opening into a "very small hallway" leading towards the back of the home. Blankets had been hung from the ceiling to create private rooms on either side of the hallway. A kitchen sat at the end of the hallway near the back of the home. Sergeant Harris testified that he walked down the hallway and entered the kitchen, where he saw the victim kneeling against a chair near the sink and holding a towel against an injury on the right side of her neck, from which poured "a lot of very bright, orangish blood." Sergeant Harris spoke with the victim and described her demeanor as alert but panicked.

A video recording taken from Sergeant Harris's body camera was played for the jury. This recording depicted Sergeant Harris walking along the hallway, noticing the victim, and exclaiming in surprise. The victim leaned against a chair beside a kitchen counter near the stove and held a towel against her neck. Blood ran down the victim's arm, coated the towel she held against her neck, and was splattered in her hair and on the floor and nearby countertop. Though she struggled to breathe, the victim attempted to speak to Sergeant Harris, who poured her a glass of water.

Paramedics arrived shortly thereafter and attempted to treat the victim's wound. However, they were unable to locate a suitable vein to administer intravenous medication, and the victim on several occasions attempted to sit up from where she lay against the chair before collapsing back against it. Paramedics repeatedly asked the victim to state her name, but the victim by this time was unable to speak clearly. One paramedic observed that the victim's injury was likely from a cut on her neck, near her right ear. After the victim became unresponsive to questions, an officer instructed the paramedics to prepare her for transportation to the hospital, where she later died.

Deputy Jorge Araiza of the Hamilton County Sheriff's Office ("HCSO") also responded to the call about the victim's stabbing, and a video recording taken from his

body camera was played for the jury. The recording depicted Deputy Araiza arriving at the home shortly after Sergeant Harris, around 9:40 p.m. Deputy Araiza entered the home and found Sergeant Harris standing over the victim, who leaned against a chair beside a kitchen counter near the stove. A large pot sat smoking atop an active burner on the stove. As Sergeant Harris encouraged the victim to concentrate on breathing, one of the home's other residents entered the kitchen and adjusted the heat of the burner. Deputy Araiza asked this resident, later identified as Vernon Deaver, whether anyone else was present in the home and instructed him to leave. Deputy Araiza then walked past the victim and Sergeant Harris and into another hallway separated by blankets hanging from the ceiling. Deputy Araiza called out for any other residents to identify themselves, and a woman responded that she was in a nearby room. Deputy Araiza entered this room, where the woman and a dog sat on a bed near an open door leading outside. The woman explained that she had opened this door recently because her friend needed to "throw his cigarette out[side]." Upon Deputy Araiza's instruction, the woman collected her dog and exited the home.

As Deputy Araiza escorted the woman out of the home, he found another resident sitting in one of the makeshift bedrooms near the entrance. After leading this resident outside, Deputy Araiza questioned him and three other residents. One resident stated that the victim had been stabbed, and Mr. Deaver identified the victim's assailant as "Kim," who Deputy Araiza later identified as the Defendant. Deputy Araiza asked the residents where the Defendant had gone after stabbing the victim, and one resident responded that the Defendant "was out back."

Deputy Araiza shined his flashlight towards the back of the home, illuminating the figures of two people sitting behind a parked vehicle several feet away. When Deputy Araiza called out for the Defendant, the two people stood, and a woman began walking towards him. As she approached, the Defendant stated through tears, "I didn't mean to. I tripped. I'm sorry, it was an accident." Deputy Araiza handcuffed the Defendant, who reiterated that the stabbing was "an accident," and continued, "I tripped over the trash can. [The victim] threw the knife at me. . . all I did was pick it up." Deputy Araiza testified that he saw blood on the Defendant's hands and on her clothing when he handcuffed her. Deputy Araiza recalled that after he escorted the Defendant to his police vehicle, he took statements from the other residents and later drove the Defendant to the sheriff's office for an interview.

On cross-examination, Deputy Araiza testified that he believed that someone had recently fled out of the open door he observed past the kitchen. He stated that the Defendant "kept moving around" while he handcuffed her, though he noted that she did not attempt to flee or otherwise evade arrest. Deputy Araiza also noted that the Defendant requested to speak with him while he took statements from the other residents and recalled

- 3 -

that she described the victim's stabbing in "a lot more detail" than she had when he handcuffed her.

HCSO Detective Brian Lockhart testified that he took photographs and collected evidence from the home for approximately three hours, beginning at 11:34 p.m. on December 17, 2021. He recalled that the home's front door opened onto a long hallway with both "traditional" and "makeshift" rooms to its right and left sides. He explained that the traditional rooms had physical doors, while the makeshift rooms had been created by hanging blankets from the ceiling. A traditional bedroom followed by a bathroom sat to the left side of the hallway, while a makeshift bedroom sat to its right. A kitchen sat to the left of the end of the hallway, with a dining room to its right. Several more makeshift bedrooms and a living room sat near the back of the home, past the kitchen and dining room. Detective Lockhart described the home as "cluttered."

Detective Lockhart also testified regarding the layout of the kitchen, and the jury reviewed the photographs he took of the area. An old stove sat at the left at the end of the hallway upon entering the kitchen, upon which sat several stereo speakers. A kitchen island divided the kitchen, atop which sat chopped onions. A washing machine sat just past the kitchen island to its right, and a trash can was located beneath the kitchen island's bar, a few feet in front of the washing machine. Behind and to the left of the kitchen island, a pathway led towards the back of the home, and a countertop wrapped around the back wall of the kitchen in an "L" shape. The back wall also included a kitchen sink, an oven, and several feet of cabinets.

Detective Lockhart recalled that he collected two knives from the home. He described the first as a pocketknife which he recovered from the bedroom located to the left of the entrance, and the second as a large kitchen knife that he collected from the top of the washing machine in the kitchen. He noted that an onion peel was stuck to the kitchen knife. He also noted that there was a "significant amount of blood" along the floor near the stove, spattered on the front of the stove, and that there was a "spot of blood" on the island's countertop and on the back counter near the sink. Detective Lockhart collected a bloody pair of boxer shorts wrapped up in a maroon towel from near the old stove, a broken clock lying on the floor of a bedroom to the right of the kitchen, and a bloodstained pair of neon yellow utility gloves and a black cell phone in front of a blanket that had been hung to create a bedroom several feet behind the kitchen, towards the back of the home. On cross-examination, Detective Lockhart recalled that he collected the broken clock because there was a report that a clock had been thrown during the altercation between the victim and the Defendant.

Dr. Steven Cogswell, a forensic pathologist at the Hamilton County Medical Examiner's Office, testified as an expert in forensic pathology. Dr. Cogswell testified that

- 4 -

he performed an autopsy on the victim's body and found she had suffered a "penetrating stab wound" in her neck "below and behind" her right ear. The knife entered the victim's neck and traveled approximately three and a half inches through her neck, passing over her spine, severing her vertebral artery, and slicing into her carotid artery and jugular vein on the left side of her neck. Dr. Cogswell testified that the knife had nearly stabbed through the opposite side of the victim's neck. He concluded that the victim had been stabbed with the knife blade pointed vertically, with the "sharp edge up." He noted that while surgery could have saved the victim's life, "she was basically too far gone" by the time she arrived at the hospital. The victim died around 10:30 p.m. on December 17, 2021, shortly after she arrived at the hospital.

Dr. Cogswell examined the two knives Detective Lockhart collected from the home. He described one as a "folding utility knife" and the other as a "kitchen boning knife." Dr. Cogswell concluded that the kitchen knife was consistent with the victim's injury. He also testified that based on his analysis of the path the knife took through the victim's neck, her injury could not have been caused by accident. He also noted that a toxicology report of the victim's blood indicated that she was under the influence of methamphetamine when she died.

On cross-examination, Dr. Cogswell explained that the victim likely did not begin bleeding immediately because the knife passed by the carotid artery located nearest its point of entry and instead sliced into the carotid artery at the opposite side of her neck. He estimated that the victim likely had enough time to walk "a step or two" in either direction before she began bleeding profusely. The Defendant presented Dr. Cogswell with several hypothetical renderings of how the victim's injury could have been inflicted, which he testified could have been consistent with her injury. However, he noted that while it was possible that the victim was facing away from her assailant when she was attacked, it would have been "a difficult angle to achieve."

HCSO Detective Denise Short testified that she interviewed the Defendant shortly after her arrest on December 17, 2021. Detective Short recalled that during this interview, the Defendant admitted that she stabbed the victim and identified the kitchen knife as the weapon she used to do so. On cross-examination, Detective Short testified that the kitchen knife was never tested for DNA or fingerprint evidence.

The State rested. Following a <u>Momon</u> colloquy, the Defendant elected not to testify but presented the following additional proof.

Hugo Ruiz testified that he worked as a criminal investigator with the Hamilton County Public Defender's Office. As part of the investigation into the Defendant's case, Mr. Ruiz traveled to the home to take measurements of the kitchen. The Defendant

- 5 -

presented a demonstrative exhibit of a floor plan of the kitchen through Mr. Ruiz's testimony using his measurements. Mr. Ruiz described the kitchen island as the "central furniture element" in the kitchen and that it was two feet and two inches wide and four feet and two inches long. He also testified that the kitchen's ceiling was less than seven feet tall, and that the midpoint of the kitchen island was located five feet and six inches away from the kitchen's far-right wall. Mr. Ruiz recalled that a broken clock with a cylindrical glass dome was recovered from the home.

On cross-examination, Mr. Ruiz explained that he believed that the clock had been thrown at some point during the altercation between the victim and the Defendant. He conceded that he did not measure the distance from the spot where the clock had been found to the kitchen island or otherwise take measurements to estimate where its thrower had been located. Mr. Ruiz also noted that the clock's glass dome was not shattered but that it was missing its battery and hour and minute hands.

David Kite testified that his mother owned the home on Bill Reed Road but that he managed it. Mr. Kite stated that he permitted residents to stay at the home because they were struggling with homelessness and that they paid him rent "when they can." At the time the victim was killed, Mr. Kite lived at the home along with at least five other residents. He testified that his bedroom was located just behind the kitchen.

Mr. Kite recalled that shortly before the victim's death, he stood in his bedroom door and watched an argument unfold between the victim and the Defendant. He testified that the Defendant stood a few feet in front of him near his bedroom and that the victim stood at "the other side of the counter" cutting onions with a kitchen knife. As their argument intensified, the victim told the Defendant, "I'm going to get you, I'm going to beat your ass." The victim then approached the Defendant, "reared back as hard as she could[,] and threw a knife, and it whizzed . . . right by her head." The Defendant reached down and picked up the knife, and when she straightened, the victim "charged at her." The victim collided with the Defendant, who still held the knife, and pushed her backwards. A physical fight ensued, during which the Defendant "slip[ped] up" and accidentally "flicked up" the knife so that it stabbed the victim in her neck. The victim and the Defendant both fell to the ground, and the Defendant attempted to staunch the victim's bleeding by applying pressure to her wound. The Defendant began "hollering" for someone to call an ambulance, and the victim stated, "Oh my god, you cut my throat, I'm going to bleed out." Mr. Kite asked another resident whether it would be better to wait for an ambulance to arrive or to drive the victim to the hospital. Mr. Kite testified that he fled the home after a resident called 911 because he feared being arrested for his outstanding warrants.

On cross-examination, Mr. Kite recalled that he was interviewed by the police on December 18, 2021. He did not recall telling detectives that he had not seen the victim's

injury and averred that if he did, it was because the victim's "hand was over it, trying to stop the bleeding." He conceded that he was unsure whether he heard the victim tell the Defendant that she would "beat [her] ass" or if the victim simply "growl[ed]" at the Defendant. Mr. Kite averred that he did not recall pleading guilty to a charge of criminal impersonation on November 5, 2019, though he conceded that he had previously pled guilty to charges of driving under the influence and driving on a revoked license.

Mr. Kite testified that he stood to the Defendant's right side while she argued with the victim and that the knife the victim threw at the Defendant hit the wall on the Defendant's left side. He stated that the victim stood between the stove and the kitchen island and that she did not have anything in her hands during her fight with the Defendant. Though Mr. Kite noted that the trashcan was shown standing upright in the photographs of the crime scene, he nevertheless testified that it was possible that the Defendant tripped over the trashcan during the fight. Mr. Kite stated, "I guess so" and "I guess" in response to the State's question of whether he told detectives that the Defendant "walk[ed] back around the counter" toward the victim after the victim threw the knife at her. However, he averred that this was not contrary to his trial testimony. Mr. Kite denied that he spoke to the Defendant before she left the home, that he instructed the Defendant to tell the police that she had accidentally stabbed the victim after falling over a trashcan, or that he cleaned the knife and placed it on the washing machine after the stabbing. He reiterated that the victim was "mean" and that the Defendant "had to do what she had to do to protect herself."

Vernon Deaver testified that he also lived at the home. He recalled that on the evening of December 17, 2021, the victim and the Defendant stood in the kitchen and began arguing while the victim chopped onions. At some point during the argument, the victim "got really mad" and threw the knife she had been using to chop onions at the Defendant. The knife struck the nearby wall, narrowly missing the Defendant, who stood at the "other side of the counter." The argument intensified, and Mr. Deaver left the kitchen to sit on a nearby couch. Shortly thereafter, the victim walked around the kitchen island and "charged at" the Defendant. Mr. Deaver was unable to see the victim's stabbing but recalled that soon after the victim charged at the Defendant, the victim fell backwards, held her hand to her neck, and stated that she was "bleeding out." The Defendant began crying, attempted to staunch the victim's bleeding, and instructed someone to call 911.

On cross-examination, Mr. Deaver agreed that he did not mention in his written statement to the police that the victim threw the knife at the Defendant or charged at the Defendant afterwards. He also recalled that he stated that the victim and the Defendant threw things at each other in his written statement. He averred that any differences between his written statement and his trial testimony were due his being "nervous and upset" in the aftermath of the victim's death.

The State called HCSO Detective Robert Rush to testify in rebuttal. Detective Rush testified that he interviewed Mr. Kite on December 18, 2021. During the interview, Mr. Kite stated that after the victim threw the knife at the Defendant, the Defendant "instantly picked up the knife" and approached the victim. Detective Rush denied that Mr. Kite stated that the victim "came from around the corner lunging" at the Defendant.

The parties rested. Upon this evidence, the jury acquitted the Defendant of the charge of voluntary manslaughter but convicted her of the lesser-included offense of reckless aggravated assault. Following a sentencing hearing, the Defendant was sentenced to a term of three years' incarceration. The Defendant filed a timely but unsuccessful motion for new trial, and this timely appeal followed.

## II. Analysis

On appeal, the Defendant argues that (1) the trial court erred in admitting extrinsic evidence of a witness's prior inconsistent statement for impeachment, (2) the trial court erred in admitting a body camera recording depicting the victim shortly after she was stabbed, and (3) the prosecutor committed misconduct by attempting to shift the burden of proof to the Defendant during closing and rebuttal arguments. We will address these arguments in turn.

### A. Admission of Mr. Kite's Prior Inconsistent Statement

The Defendant first argues that the trial court erred in admitting extrinsic evidence of Mr. Kite's prior inconsistent statement to Detective Rush during his December 18, 2021 interview to impeach Mr. Kite's trial testimony. She argues that Mr. Kite never confirmed or denied that the Defendant approached the victim first after the victim threw the kitchen knife at her, so the introduction of his prior inconsistent statement was improper. The State responds that the admission was valid because Mr. Kite equivocated when presented with the substance of his prior statement.

The Tennessee Rules of Evidence provide that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness[,]" through impeachment. Tenn. R. Evid. 607. Included among the various avenues of impeachment is impeachment via proof of a witness's prior inconsistent statement. "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon[.]" Tenn. R. Evid. 613(b). Accordingly, before extrinsic evidence of a witness's prior inconsistent statement is admitted, the impeaching party must lay a foundation for its admission by drawing the witness's attention to "the place, persons present, time of the statement, and to the substance of the statement." State v. Martin, 964

- 8 -

S.W.2d 564, 567 (Tenn. 1998) (citing Middle Tenn. R.R. Co. v. McMillan, 134 Tenn. 490, 515-16 (1916)). Extrinsic evidence of a witness's prior inconsistent statement becomes admissible once the witness "either denies or equivocates as to having made" the statement, or else testifies that he or she is unable to recall making the statement. Martin, 964 S.W.2d at 567 (citing State v. Kendricks, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996). On the other hand, when a witness unequivocally admits to having made the prior inconsistent statement, extrinsic evidence of that statement remains inadmissible because its introduction would be "both cumulative and consistent" with his or her testimony. State v. Foust, 482 S.W.3d 20, 39 (Tenn. Crim. App. 2014) (citing Martin, 964 S.W.2d at 567). We review a trial court's decision to admit extrinsic evidence of a witness's prior inconsistent statement for impeachment purposes for an abuse of discretion. State v. Bates, No. E2014-01741-CCA-R3-CD, 2015 WL 9019818, at *6 (Tenn. Crim. App. Dec. 15, 2015) (citing Hunter v. Ura, 163 S.W.3d 686, 698 (Tenn. 2005)).

In this case, the Defendant did not contest that she stabbed the victim but argued that she did so in self-defense. During her opening statement, she argued that the victim "instigated" the argument between the victim and the Defendant, that the victim threw the knife at the Defendant, that the victim promptly "went around the [kitchen] island and charged at" the Defendant, and that the Defendant defended herself by stabbing the victim with the knife the victim had recently thrown at her. In her case-in-chief, the Defendant called Mr. Kite to testify that the victim threw the knife at the Defendant, that the victim picked the knife up, that the victim then "charged at" the Defendant, and that there was a "slip up" in which the Defendant accidentally "flicked up" the knife so that it stabbed the victim in her neck. On cross-examination, Mr. Kite recalled that he had been interviewed by the police on December 18, 2021. The following exchange then occurred:

Q:    And you said you saw [the victim] throw the knife from behind that counter; correct?

A:    Yes.

Q:    Then detectives asked you, "What does [the Defendant] do next?" And you told them, "She's walking back around the counter"; correct?

A:    I guess so.

Q:    So [the Defendant] came around that counter, that's what you told detectives?

- 9 -

A:     No, we [were] standing all the way on this side and [the Defendant] was coming back around and [the victim] was coming back around on this other side. When they met, they met at the end of that counter.

Q:     You told detectives that [the Defendant] came around that counter, didn't you?

A:     I guess.

Q:     Today, you told a very different story to the jury; right?

A:     I didn't tell no different story to the jury. That girl was mean and she was mad and Kim had to do what she had to do to protect herself.

Q:     That's not what you told detectives?

A:     I don't know what you think, you know, I told detectives, but, you know, you want to run it all out, she did what she had to do. That girl was mean. That [doesn't] mean I didn't love her, but she was mean.

When asked whether the Defendant stabbed the victim at the kitchen island near where blood had been found, Mr. Kite responded,

A:     No, she didn't stab her, she didn't come at her with the knife, and she wasn't swinging the knife trying to stab her.

Q:     That's not what you told detectives; right?

A:     In fact, what I told detectives was the way the knife [came] off of her midsection and her arms swung up as [if] they [were] stuck together, she wasn't swinging that knife at her to cut her with it. So exactly what I told them was that [the] knife flicked up.

The State then requested a bench conference, seeking to play the recording of Mr. Kite's interview with Detective Rush to impeach Mr. Kite, during which the trial court stated,

THE COURT:     I think you've effectively impeached him because he said[,] "I guess so," when you said your memory was better at the time. He has not been disagreeing with you at all, except for some things like I think he disagreed with you when you said where the stabbing occurred. That's

about it. I don't think that's enough to get the whole statement in. Anything else?

[THE STATE]: We can call the detective to impeach him.

THE COURT: I mean, if he said, "No, I never said that," then I think you get to call the detective to say "yes, he did." If she said, "I guess I did say that," then you've effectively impeached him already. Only thing he didn't agree to was him telling the detectives that the stabbing happened at the corner of the island. So[,] if he said that in his statement, you can call the detective and say he actually did say that, but I think that's the limitation [to] which you'll be able to impeach him, if you want to do that. So overruled.

The following day, the State presented its rebuttal proof. After the State called Detective Rush to testify and began questioning him regarding Mr. Kite's December 18, 2021 interview, the Defendant objected as follows:

[DEFENDANT]: Your Honor, this is the same issue that the Court ruled on yesterday when the State attempted to play the recorded interview. At no point did Mr. Kite deny the statements that he made in the interview, this would be improper third-party impeachment. It is also eliciting hearsay. I don't know what specific statement the State is attempting to impeach Mr. Kite on, but I think, regardless, I would object that it is improper impeachment and hearsay.

THE COURT: As I recall, Mr. Kite did disagree with the State on some things, ["]Didn't you tell the detective you didn't see["] some angle that he testified to. And so as long as it's limited to impeachment, then I think it's proper. Also, it's not being admitted for the truth of the matter asserted, it is meant to impeach. So[,] the jury will have an instruction that impeachment evidence is considered not for the truth of the matter asserted, but just for impeachment. So long as it stays within the realm of any inconsistency, then that's fine. If you want to renew your objection if it gets closer to stuff that's already said, try to bolster a witness's testimony that helps the State, feel free to renew your objection.

The State specified during the bench hearing that it intended to inquire as to "who went around the corner first," and the trial court overruled the Defendant's objection. Detective Rush then testified that Mr. Kite stated during his December 18, 2021 interview that the Defendant "instantly picked up the knife" the victim had thrown at her and

- 11 -

approached the victim. Detective Rush also denied that Mr. Kite stated that the victim "came from around the corner lunging" at the Defendant, as he had testified at trial.

The Defendant argues that the trial court abused its discretion by permitting Detective Rush to testify regarding his interview with Mr. Kite because Mr. Kite did not deny that he told detectives that the Defendant "instantly picked up the knife" and approached the victim or that the victim "came around the corner lunging at" the Defendant. This argument is not supported by the record. While generally, the best practice in confronting a witness with their prior inconsistent statement is to read the prior statement to the witness, only presentation of the substance of the statement is required. State v. Myers, 634 S.W.2d 620, 622, n.2 (Tenn. Crim. App. Jan. 7, 1982); Martin, 964 S.W.2d at 567; see also James v. State, 506 S.W.2d 797, 800-01 (Tenn. Crim. App. Nov. 23, 1973) (finding that the trial court erred by requiring a verbatim confrontation of "the questions asked [to the witness] and his answers" in order to admit his prior inconsistent statement because "it is sufficient to direct the attention of the witness to the [s]ubstance of the purported words.").

The State asked Mr. Kite on cross-examination whether he told Detective Rush that the Defendant "came around that counter" after the victim threw the knife at the Defendant. He twice equivocated by stating, "I guess" and "I guess so," and once denied the substance of the statement by responding, "No," and explaining that the victim and the Defendant approached each other and "met at the end of that counter." Mr. Kite thus admitted that he had been interviewed by Detective Rush but maintained that the substance of his statements during that interview was consistent with his trial testimony. See State v. Bates, No. E2014-01741-CCA-R3-CD, 2015 WL 9019818, at *9 (Tenn. Crim. App. Dec. 15, 2015) (finding a witness's prior inconsistent statement admissible for impeachment because "[a]lthough [the witness] did not outright deny actually providing a statement to the police following the offenses, the overall tenor of his testimony was a complete repudiation of . . . the contents of the statement."). Once the State laid that foundation, it was permitted to impeach Mr. Kite's testimony with extrinsic evidence of his prior inconsistent statement. Accordingly, the trial court did not err in permitting the State to question Detective Rush about Mr. Kite's statements during his interview. Further, the trial court instructed the jury that it was not to consider the extrinsic evidence of Mr. Kite's prior inconsistent statement as substantive evidence and reminded them that it was only to be considered for impeachment of Mr. Kite's testimony both immediately after Detective Rush testified and during its final jury instructions. The Defendant is not entitled to relief.

## B. Admission of Sergeant Harris's Body Camera Video

The Defendant also argues that the trial court erred by partially denying her motion *in limine* in which she sought to exclude the video recording taken from Sergeant Harris's

body camera under Tennessee Rule of Evidence 403(b). She also sought the exclusion of the victim's identification of the Defendant as her assailant as inadmissible hearsay.

At the March 7, 2023 hearing on the Defendant's motion, the video from Sergeant Harris's body camera was played, and he testified that it was a true and accurate depiction of what he observed while at the home. He recalled that when he entered, he exclaimed in shock because he had never seen so much blood before and that it had a distinctive "orang[e]y or reddish color." He testified that the victim held a towel to the side of her neck, and though he believed he saw an injury there, it was difficult to determine precisely where her injury was because of the sheer amount of blood on and around the victim. He recalled that the victim attempted to respond to some of his questions but that her voice was "gurgling," as though liquid was in her lungs or throat. Though he was unable to clearly understand what the victim said when he asked her to identify her assailant, he recalled that "the last name Smart sticks out to me." He also testified that he did not believe that the victim died at the home and recalled that she was removed from the home on a gurney. On cross-examination, Sergeant Harris testified that the video depicted the crime scene as he saw it shortly after the victim's stabbing but that certain items were moved around once emergency medical services and additional police officers arrived.

Dr. Cogswell testified regarding the autopsy he performed upon the victim's body. He described the knife's trajectory as it passed through the victim's neck and testified that it appeared to be deliberately caused and not accidental. However, he averred that he was unable to discern that assailant's intent in inflicting the injury from his examination.

As relevant to this appeal, the Defendant argued that the video's probative value was limited to the victim's identification of the Defendant as her assailant, which she contended was inadmissible hearsay. The Defendant maintained that the remainder of the video was so prejudicial that it outweighed any probative value lent by the identification, noting that the video depicted the victim's "condition deteriorating" as she neared death. The Defendant further identified the presence of the "blood all over the floor" and on the victim as prejudicial, noting that Sergeant Harris stated that the crime scene was among the most gruesome he had seen. Though she conceded that the video showed the layout of the kitchen before it was disturbed by paramedics seeking to treat the victim, Sergeant Harris could nevertheless provide sufficient testimony to describe the layout of the kitchen without admitting the prejudicial depiction of the victim's injury. Additionally, the Defendant argued that other witnesses would identify the Defendant, so inasmuch as the video was offered for identification, its admission would be cumulative, further diminishing its probative value.

The State responded that the victim's identification was admissible under the dying declaration exception to the rule against hearsay. The State further contended that the

remainder of the video was not unduly prejudicial because it did not show the victim being stabbed by the Defendant, being carried away from the home on a gurney, or the moment of her death. The State argued that the video depicted the "most authentic" evidence of the crime scene shortly after the victim was stabbed, noting that the layout of the kitchen would likely be relevant to the Defendant's argument that she acted in self-defense.

The trial court concluded that the victim's identification of the Defendant as her assailant was not a dying declaration and redacted that portion of the video. However, it admitted the remainder of the video, finding that it was "definitely relevant, especially if there is going to be a self-defense argument," in light of its depiction of the kitchen's "tight quarters," "how far away the [kitchen] island is from the stove," "where a trash can might be," where the victim was found, and where her blood had splattered. Though the trial court noted that the video showed "a lot of blood" which was "shocking" to Sergeant Harris, it concluded that any resultant danger of undue prejudice from the presentation of this evidence to the jury did not substantially outweigh its probative value.

In this appeal, the Defendant contends that the trial court erred in admitting the video because it was unfairly prejudicial and presented cumulative evidence, noting that "at least three other evidentiary alternatives existed" to prove the layout of the kitchen as Sergeant Harris saw it. The State responds that the trial court did not abuse its discretion in admitting the video because its depiction of the undisturbed crime scene was highly relevant to the Defendant's self-defense claim and that this probative value was not substantially outweighed by the danger of undue prejudice.

The Tennessee Rules of Evidence provide that evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Even if evidence is determined to be relevant, it may nevertheless be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as evidence which has "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). In determining whether evidence is unfairly prejudicial, the trial court "must consider, among other things, the questions of fact the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." State v. Griffis, 964 S.W.2d 577, 594 (Tenn. 1997) (abrogated on other grounds by State v. Thomas, 687 S.W.3d 223 (Tenn. 2024)). The decision of whether to exclude evidence pursuant to Rule 403 is left to the trial court's discretion, and we will accordingly

not disturb this decision absent an abuse of that discretion. State v. Young, 196 S.W.3d 85, 105 (Tenn. 2006) (citing Banks, 564 S.W.2d at 949).

The Defendant's arguments against the video's admission center around her characterization of its contents as "gruesome," "horrifying," and "sickening." However, such evidence is admissible so long as it is not presented "solely to inflame the jury and prejudice them against the defendant" and is relevant to the issues presented at trial. State v. Adams, 405 S.W.3d 641, 658 (Tenn. 2013) (citing Banks, 564 S.W.2d at 950-51). While the Defendant argues that the video had no probative value and served only to inflame the jury's passions and prejudices, she implicitly concedes that its depiction of the undisturbed crime scene was relevant to her theory of self-defense by arguing that this probative effect could have been achieved through the presentation of other evidence. The Defendant presents no contest to the trial court's findings that the video was relevant to show the kitchen's "tight quarters," including the location of a trash can and the distance between the stove and the kitchen island, as well as the depiction of where the victim's blood splattered and where she leaned against the nearby cabinets in an attempt to staunch her bleeding. Instead, she argues that the trial court should have excluded it because Sergeant Harris's testimony and Detective Lockhart's photographs sufficed to prove the kitchen's layout.[1]

Although the video indeed depicted several of the same scenes shown in Detective Lockhart's photographs, it also served as the best evidence of where the victim came to rest immediately after her stabbing, which was relevant in light of the Defendant's theory of self-defense given the "tight quarters" of the crime scene and Dr. Cogswell's testimony that the victim would have likely only had enough time to walk "a step or two" in either direction before she began bleeding profusely. See State v. Bigbee, 996 S.W.2d 797, 807 (Tenn. 1994) superseded on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004) (affirming a trial court's admission of a recording of the victim's body shortly after his murder despite the presence of numerous other photographs of his body); State v. Reid, No. M2001-02753-CCA-R3-CD, 2003 WL 23021393, at *27 (Tenn. Crim. App. Dec. 29, 2003), aff'd by State v. Reid, 164 S.W.3d 286 (Tenn. 2005) ("[W]hile the videotape and the other evidence admitted in this case may have contained some of the same material, it was not error to admit the videotape."). Additionally, Sergeant Harris's testimony regarding the layout of the kitchen does not render the video's admission needlessly cumulative. The transcript of Sergeant Harris's testimony spans approximately

---

[1] The Defendant also contends that the video presented cumulative evidence because "the State late-discovered 3D images produced by a Leica device which scanned the kitchen and allows for measuring objects and rooms." Because these images are not included in the record, we decline to consider the merits of the Defendant's claim as it relates to this issue. See Tenn. R. App. P. 24(b). Regardless, the images were not introduced at trial, so it can hardly be claimed that the video's admission was needlessly cumulative to this evidence.

sixteen pages and focuses largely on his actions in responding to the call of the stabbing and his interactions with the victim; his description of the home's layout accounts for a small fraction of this testimony and provided far less detail than was conveyed to the jury through the video taken from his body camera and the photographs. In other words, while the video bore similarities to Detective Lockhart's photographs and to Sergeant Harris's testimony, each piece of evidence served different purposes and were probative of issues central to the case. Furthermore, though the video of the crime scene was unpleasant and shocking to the officer who recorded it, any danger of unfair prejudice did not substantially outweigh the probative value of permitting the jury to see the victim in the crime scene shortly after her stabbing, particularly in light of the nature of the Defendant's self-defense claim. The trial court thus did not abuse its discretion in admitting the video, and the Defendant is not entitled to relief.

### C. Closing Arguments

The Defendant also argues that the State made improper arguments during closing and rebuttal arguments. She contends that by referring to a lack of evidence in support of the Defendant's theory of self-defense, the State attempted to shift to the Defendant the burden of proving beyond a reasonable doubt that she acted in self-defense. The Defendant concedes that she failed to raise this claim at trial but nevertheless requests that we review the issue for plain error. The State responds that the Defendant is not entitled to relief because she has failed to prove the breach of a clear and unequivocal rule of law.

As the Defendant correctly notes, this issue is waived for appellate review for her failure to contemporaneously object to the challenged portions of the State's closing and rebuttal arguments at trial. See State v. Enix, 633 S.W.3d 692, 700-01 (Tenn. 2022) ("[A] defendant's failure to contemporaneously object to alleged prosecutorial misconduct during closing argument results in waiver on appeal."). In the context of closing arguments, a contemporaneous objection is especially important because it provides the trial court the opportunity to assess the allegedly improper argument and, if necessary, caution the prosecution or issue a curative instruction to the jury. State v. Jordan, 325 S.W.3d 1, 57-58 (Tenn. 2010). A contemporaneous objection further provides the State with the opportunity to correct or clarify any statements which might appear to have crossed the line into impropriety.

However, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial," through plain error review. Tenn. R. App. P. 36(b). Under plain error review, relief will only be granted when all five of the following prerequisites are met:

(1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been violated; (4) the accused must not have waived the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice.

State v. Rimmer, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing State v. Martin, 505 S.W.3d 492, 504 (Tenn. 2016)). If any one of these factors is not satisfied, this Court need not consider the remaining factors. State v. Smith, 492 S.W.3d 224, 232 (Tenn. 2016). The defendant bears the burden of persuasion to show that he or she is entitled to plain error relief. State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007). Additionally, the plain error must have been of such magnitude that it probably changed the outcome of the trial. Smith, 492 S.W.3d at 232 (citing State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010)).

"Closing arguments serve to sharpen and to clarify the issues that must be resolved in a criminal case" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." State v. Hawkins, 516 S.W.3d 1, 47 (Tenn. 2017) (internal quotation marks omitted) (quoting State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008)). Accordingly, our supreme court has often described closing argument as "a valuable privilege that should not be unduly restricted." State v. Reid, 164 S.W.3d 286, 320 (Tenn. 2005). That said, the trial court maintains discretion to control closing arguments, and its action in either restraining or refusing to check the parties will not be reversed on appeal absent a showing of an abuse of discretion. White v. State, 356 S.W.2d 411, 417 (1962). "The bounds of proper argument largely depend upon the facts in evidence, the character of the trial, and the conduct of opposing counsel." Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995).

In general, closing arguments must be temperate, predicated on the evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or the law. State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1997). Within this framework, a prosecutor "may argue all reasonable inferences from the evidence in the record, unless the prosecutor knows the inference to be false." ABA Criminal Justice Standards for the Prosecution Function, Standard 3-6.8(a) (4th ed. 2017). Both the prosecution and defense counsel are equally "expected to be zealous advocates, and as a result, should be afforded great latitude in both the style and the substance of their arguments." Hawkins, 516 S.W.3d at 47 (citing Banks, 271 S.W.3d at 130-31). The prosecution's right to use colorful and forceful language is no less than defense counsel's; so long as the parties do not stray from the evidence and the reasonable inferences that may be drawn therefrom, "make derogatory remarks[,] or appeal to the jurors' prejudices," they are generally permitted considerable leeway in their oratorical emphasis. Enix, 633 S.W.3d at 701 (citing Banks, 271 S.W.3d at 131); see also Post v. State, 580 S.W.2d 801, 808

- 17 -

(Tenn. Crim. App. 1979). However, prosecutors "must not lose sight of their duty to seek justice impartially and their obligation to see to it that the defendant receives a fair trial." Hawkins, 516 S.W.3d at 47-48 (internal quotation marks omitted) (quoting Banks, 271 S.W.3d at 131). As such, prosecutors must refrain from misstating the applicable law during closing arguments. State v. Hatcher, 310 S.W.3d 788, 813-814 (Tenn. 2010) (citing State v. Houston, 688 S.W.2d 838, 841 (Tenn. Crim. App. 1984) ("It is the province of the trial judge to state to the jury the law of the case, and it is not advisable for counsel to attempt to do so in final argument because of the possibility of error in their summation.")); see also State v. Lindsay, 180 Wash. 2d 423, 434 (2014) ("Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct.").

This Court has recognized five general areas of prosecutorial misconduct which may arise during closing argument:

> (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge.

State v. Jones, 568 S.W.3d 101, 145 (Tenn. 2019) (citing State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)). As "[i]t is impossible to set out in detail what can and cannot be said in closing argument," this list is not exhaustive. Goltz, 111 S.W.3d at 6.

This Court will not overturn a defendant's conviction unless the prosecution's closing argument is so improper or inflammatory that it prejudiced the jury's verdict against the defendant. Jones, 568 S.W.3d at 145 (citing Banks, 271 S.W.3d at 131, and Reid, 164 S.W.3d at 344). As other courts have noted, the line between proper and improper closing argument is often thin, and our inquiry into whether the State crossed that line is necessarily context-specific. United States v. Moore, 651 F.3d 30, 53 (D.C. Cir. 2011) ("Because the line between permissible and impermissible arguments will not always be clear, the inquiry is necessarily contextual."); State v. Martinez, 311 Kan. 919, 923 (Kan. 2020) ("Often the line between permissible and impermissible argument is context dependent."); Kinseth v. Weil-McLain, 913 N.W.2d 55, 73 (Iowa 2018) ("Attorneys have a duty to refrain from crossing the admittedly hazy line between zealous advocacy and misconduct."). Our analysis of whether the prosecutor's statements in closing argument crossed the thin line into impermissibility is guided by the following factors:

- 18 -

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (adopting the factors outlined in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The Defendant argues that the prosecutor attempted to shift the burden of proof during closing and rebuttal arguments. During closing arguments, the prosecutor stated,

> Who wiped the knife? Was it [Mr. Kite]? Was it [the Defendant]? And why would they do that? Change evidence from a crime scene, pick up a knife from where it would be laying on the floor, obviously, and put it on a washing machine, or a dryer. That's because they don't want you or law enforcement to know exactly what happened. They're hiding something. Just like the defense continues to change. Maybe someone won't tell on me, maybe they'll believe it's an accident, maybe, just maybe, they'll believe that I acted in self-defense.

> So[,] because the evidence tends to show that there is an onion on the knife, we will take [Mr.] Kite, potentially, at his word, that that knife was thrown at [the Defendant] first. There's evidence to corroborate that. *There is not evidence to support self-defense.*[2]

Following the prosecutor's closing argument, the Defendant presented a theory of self-defense, arguing that there were reasonable grounds for her to fear imminent death or serious bodily injury from the victim because the victim's use of "[t]he deadly weapon takes care of that. And then [the victim's] charging after her takes care of that." The Defendant also argued that the testimony presented by the defense witnesses was consistent with the physical evidence and requested that the jury accredit it over the State's proof.

In rebuttal, the prosecutor responded,

---

[2]    The statements the Defendant challenges as improper are identified in italics. Because we review challenged statements made during closing arguments in context, we have placed the challenged statements in the context in which they were made to facilitate our review of the Defendant's claim.

- 19 -

The defense has a problem and they know it, which is why they avoided it in their argument. As a matter of fact, the defense gave . . . you the instruction on self-defense. You all saw it up there; right? Did you notice they didn't address the issue that makes this important? There has to be an imminent danger of death or great bodily or serious injury. See, that's why the clock's important, that's why the charge is important. See, once the knife is thrown and [the victim] is unarmed, there is no longer any danger of imminent death or bodily injury.

. . . .

Now, the fact is here, is that *there is absolutely no evidence that supports self-defense*. None. Once that knife was thrown, and I'm not saying whether the knife was thrown or not, because who are the people telling us that a knife got thrown? People that, quite frankly, you shouldn't believe. But let's just go under the hypothesis that the knife was thrown. The threat's over once it's known, unless you have another object used as a weapon, which is why they have focused on the clock, or [the victim] charges at the [D]efendant. That's why it's important for them to do that. That's why it's extremely important for them to get that out. Unfortunately, the scene doesn't support that. As a matter of fact, the scene tells you something different.

Now, the defense wants you to believe, well, you know, there's all this blood over here and there's a substantial amount of blood on this counter in two distinct spots, plus there is what appears to be a little bit of arterial spray on the counter. But the fact is, is where the defense [says] blood should be is nowhere to be found. But they try to hang their hat on, "Well, [Dr.] Cogswell says it won't come out immediately." He said a step or two, at most, is actually what he said. That step or two doesn't get you over here, it gets you over here. And a wound on the right side is not going to have blood over here, it's going to have blood over here. And that's nowhere to be found.

Though the transcript clearly conveys a record of what occurred at the trial court, the Defendant has failed to demonstrate a breach of a clear and unequivocal rule of law or that any of her substantial rights were adversely affected. In her opening statement, the Defendant argued that she acted in self-defense, and the State preemptively responded to that defense during closing argument and then reiterated during rebuttal that the jury should not accept such a theory because there was no evidence to substantiate it. The prosecutor's statements referred to matters within the evidence before the jury, reasonable inferences

which the jury could draw from that evidence, and the relative weakness of the Defendant's asserted theory of self-defense. At no point did the prosecutor argue that the Defendant bore the burden of proving beyond a reasonable doubt that she acted in self-defense; he merely argued to the jury that the evidence did not support such a theory. Cf. State v. Thompson, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *6-7 (Tenn. Crim. App. July 14, 2023) (holding that the prosecutor's statement that "[i]f [the defendant] wanted to have evidence put before you, all he had to do is bring it" was not an attempt to shift the burden of proof because it was made in response to an argument the defendant made during his own closing argument that the State failed to investigate or obtain key evidence); State v. Duggan, No. E2010-00128-CCA-R3-CD, 2011 WL 4910368, at *16-17 (Tenn. Crim. App. Oct. 17, 2011) (the prosecutor's repeated question of "Is there proof of theft?" during closing arguments did not shift the burden of proof because, when read in context, it served to illustrate the inconsistencies in the defendant's statements and testimony); Tillman v. State, 306 So.3d 292, 293-94 (Fla. Dist. Ct. App. 2020) (the prosecutor's statement that "[t]here needs to be something in the evidence to support that [the defendant] acted in self-defense, and there isn't" did not shift the burden of proof and instead "reflect[ed] the State's belief that it overcame its burden of proof based on the testimony it presented or by inference in its case-in-chief"). As this is not improper closing argument, the Defendant has failed to demonstrate a breach of a clear and unequivocal rule of law.

For her part, the Defendant reminded the jury that the State bore the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense at least three times. Further, the trial court instructed the jury that "[t]he burden is on the State to prove beyond a reasonable doubt that the [D]efendant did not act in self-defense. To convict the [D]efendant, the State must prove beyond a reasonable doubt that the [D]efendant did not act in self-defense." "In the context of the parties' closing arguments, as elsewhere, we presume that the jury follows its instructions." Young, 196 S.W.3d at 111 (quoting Jordan, 325 S.W.3d 1 at 66). Accordingly, the Defendant has also failed to demonstrate that any of her substantial rights were affected by the allegedly improper closing and rebuttal arguments. Because the Defendant has failed to establish two of the five factors for plain error review, we need not consider whether the remaining factors support our review. The Defendant is not entitled to relief.

### III. Conclusion

Following our review, we affirm the judgment of the trial court.

s/ W. MARK WARD
W. MARK WARD, SPECIAL JUDGE